## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**STARQUINESHIA PALMER,**

      **Petitioner,**

**v.**                           **Case No. 4:20cv130-MW/MAF**

**MARK INCH, Secretary,**
**Department of Corrections,**

      **Respondent.**

_____/

## REPORT AND RECOMMENDATION

On January 30, 2020, Petitioner Starquineshia Palmer, a state inmate proceeding pro se, filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. ECF No. 1. On July 30, 2020, Respondent filed an answer, with exhibits. ECF No. 11. Petitioner has not filed a reply, although she was given the opportunity to do so. *See* ECF No. 10.

The matter was referred to the undersigned United States Magistrate Judge for report and recommendation pursuant to 28 U.S.C. § 636 and Northern District of Florida Local Rule 72.2(B). After careful consideration, the undersigned has determined no evidentiary hearing is required for the disposition of this matter. *See* Rule 8(a), R. Gov. § 2254 Cases. The pleadings and attachments before the Court show Petitioner is not entitled to federal habeas relief and this § 2254 petition should be denied.

## Procedural Background

On October 6, 2011, a grand jury in the Second Judicial Circuit, Leon County, case number 11CF02774, returned an indictment charging Petitioner Starquineshia D. Palmer with first degree murder, by stabbing with a knife, a capital felony, in violation of section 782.04(1)(a)1., Florida Statutes, in connection with events that occurred in the early morning hours of September 4, 2011, resulting in the death of Shannon Washington.  Ex. A at 10-11. [1]  Palmer and Washington had been in a same-sex relationship for two years.  *See* Ex. I at 761.  At the time of the stabbing, Palmer lived in Bradenton and had been visiting Washington at her home in Tallahassee since about the last week in August 2011.  *See id.* at 767, 777-79.  Washington was a basketball player at Florida A&M University.  *See* Ex. E at 166-68.

Palmer ultimately proceeded to a jury trial in March 2014, before Judge James C. Hankinson.  Exs. D-K (transcript of jury trial); Ex. I at 760.  The prosecution presented several witnesses as well as evidence including text messages Palmer sent to her mother around the time of the murder and the

---

[1] Hereinafter, all citations to the state court record, "Ex. –," refer to exhibits submitted with Respondent's answer, ECF No. 11.

recorded (video and audio) police interview with Palmer; the defense also presented witnesses, including Palmer herself.  Exs. D-K; Ex. F at 393-438 (recorded interview); Ex. I at 760-875 (Palmer's testimony).    Palmer contended her relationship with Washington involved domestic violence and she had acted in self-defense or upon sudden provocation/in the heat of passion when she stabbed Washington.  *See, e.g.*, Ex. D at 37-53; Ex. F at 417-23; Ex. I at 802-12.  On March 14, 2014, the jury returned a verdict finding Palmer guilty as charged.  Ex. A at 108-09; Ex. K at 1135-36.  The judge adjudicated her guilty and sentenced her to life in prison.  Ex. A at 110-19; Ex. K at 1139.

Palmer appealed her conviction and sentence to the First District Court of Appeal (First DCA), assigned case number 1D14-1711, and raised four points.  Ex. P (Initial Brief).  The State filed an Answer Brief.  Ex. Q.  On October 28, 2015, the court affirmed the case without a written opinion.  Ex. R; Palmer v. State, 177 So. 3d 255 (Fla. 1st DCA 2015) (table).  The mandate issued November 13, 2015.  Ex. R.  Palmer did not seek further review in the Florida Supreme Court or the U.S. Supreme Court.  *See* ECF No. 1 at 2; ECF No. 11 at 19.

On July 20, 2016, Palmer filed a pro se motion for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.850, which did not raise any specific grounds for relief and requested the court to hold the proceeding in abeyance for purposes of the federal habeas timeline.  Ex. S at 4-8.  By order on August 22, 2016, the state post-conviction trial court, Judge Hankinson, dismissed the motion as legally insufficient, allowed her 60 days to file a legally sufficient motion, and denied her request to stay the proceeding.  *Id.* at 9.  On September 20, 2016, Palmer filed another postconviction motion with no grounds for relief and a request to stay the proceedings.  *Id.* at 10-16.  By order on September 28, 2016, the court found the motion facially insufficient, allowed her until December 22, 2016, to file a legally sufficient motion, and denied her request to stay the proceeding.  *Id.* at 17-18.

On December 19, 2016, Palmer filed an amended postconviction motion, in which she raised fourteen (14) grounds.  *Id.* at 19-65 (exclusive of attachments).  By order on January 12, 2017, Judge Hankinson directed the State to respond to Palmer's motion.  *Id.* at 82.  In response, the State requested the matter be set for an evidentiary hearing.  *Id.* at 83-84.  By order

on February 7, 2017, Judge Hankinson granted an evidentiary hearing.  *Id.* at 85.  Palmer filed a motion requesting appointment of counsel, *id.* at 86-89, which the court granted by order on March 6, 2017, *id.* at 94.

An evidentiary hearing occurred August 25, 2017, during which Palmer was represented by counsel, Scott Miller.  Ex. S at 106-215 (transcript of hearing).  Palmer and both of her trial attorneys, Alice Copek and Andy Thomas, testified at the evidentiary hearing.  *Id.*  That same day, the state postconviction trial court rendered an order denying postconviction relief, explaining Palmer "failed to show that she received ineffective assistance of counsel or that she was prejudiced by any alleged deficiency" for "the reasons as announced on the record."  Ex. S at 98.

Palmer appealed to the First DCA and her counsel, David Collins, filed an Initial Brief in case number 1D17-3601, raising one point:  "Counsel was ineffective for failing to advise Appellant as to the benefits of being tried by a 12-person jury over a 6-person jury and advise her not to waive her right to be tried by a 12-person jury."  Ex. T at ii, 10-28.  Palmer also filed a pro se brief, Ex. U, and an appendix, Ex. V, by which she appears to challenge the denial of her remaining grounds.  The State filed an Answer Brief.  Ex. W.

Palmer's counsel filed a reply brief.  Ex. X.  On February 25, 2019, the First

DCA per curiam affirmed the case without a written opinion.  Ex. Y; Palmer

v. State, 264 So. 3d 140 (Fla. 1st DCA 2019) (table).  The mandate issued

March 18, 2019.  Ex. Z.

Palmer, through counsel, sought certiorari review in the U.S. Supreme

Court.  Ex. AA.  On October 7, 2019, the U.S. Supreme Court denied the

petition for certiorari.  Ex. CC.

As indicated above, on January 30, 2020, Palmer filed a pro se petition

for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  ECF No. 1.  In her

petition, Palmer raises sixteen (16) grounds, including several grounds

alleging ineffective assistance of counsel (IAC) and two grounds labeled as

Ground 7, which are listed below as (7)(a) and (b):

(1)  **Trial Court Error**:  "The trial court erred in overruling defense [counsel's] objection to the prosecutor eliciting an opinion regarding battered spouse syndrome."  *Id.* at 9.

(2)  **Trial Court Error**:  "The trial court erred in overruling defense [counsel's] objection to the prosecutor eliciting victim character evidence."  *Id.* at 11.

(3)  **Trial Court Error**:  "The trial court erred in denying the defense motion to exclude untimely disclosed prejudicial evidence."  *Id.* at 12.

(4)    **Trial Court Error**:  "The jury instruction on justifiable use of non-deadly force negated [Palmer's] right to use non-deadly force against unlawful force and constituted fundamental error."  *Id.* at 14.

(5)    **IAC**:  "Counsel was ineffective for allowing [Palmer] to be tried and convicted by a six-person jury where statutory law requires all capital cases [have] a twelve-person jury."  *Id.* at 16.

(6)    **IAC**:  "Counsel was ineffective for failing to object to [the] prosecutor (a) misstating the law concerning sudden provocation [and] (b) incorrectly defining sudden provocation by personally opining its meaning during closing arguments."  *Id.*

(7)    (a)  **IAC**:  "Counsel was ineffective for failing to move for mistrial."  *Id.*

    (b) **IAC**:  "The cumulative effect of counsel failing to object to [the] prosecutor's improper and prejudicial comment concerning sudden provocation during closing arguments and failing to move for mistrial deprived [Palmer] of her U.S. Constitutional right to a fair trial and her right to due process of law."  *Id.* at 17.

(8)    **IAC**:  "Counsel was ineffective for failing to object to the confusing heat of passion upon a sudden provocation jury instruction."  *Id.*

(9)    **IAC**:  "Counsel was ineffective for failing to object to the heat of passion upon sudden provocation not being made an option on the verdict form."  *Id.*

(10)   **IAC**:  "Counsel was ineffective for failing to file a judgment of acquittal as to the confusing jury instruction and incomplete verdict form."  *Id.* at 18.

(11)   **IAC**:  "Counsel was ineffective for failing to strike [a] juror for cause."  *Id.*

(12) **IAC**: "Counsel was ineffective for failing to invoke statutory immunity and file [a] pretrial motion to dismiss under Rule 3.190(b)." *Id*.

(13) **IAC**: "Counsel was ineffective for failing to properly question Karla Fischer." *Id*.

(14) **IAC**: "Counsel was ineffective for failing to object to the State questioning Karla Fischer." *Id*. at 19.

(15) **IAC**: "Counsel was ineffective for failing to object to Greg Prichard being [a] rebuttal witness." *Id*.

(16) **IAC**: "Counsel failed to subject the State's case to meaningful adversarial testing." *Id*.

On July 30, 2020, Respondent filed an answer to the petition, with exhibits. ECF No. 11.  Palmer has not filed a reply, although she was given the opportunity to do so.  *See* ECF No. 10.

## Analysis

Pursuant to 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), federal courts may grant habeas corpus relief for persons in state custody.  Section 2254(d) provides, in pertinent part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the

claim –

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  *See, e.g.,* Cullen v. Pinholster, 563 U.S. 170, 180-83 (2011); Gill v. Mecusker, 633 F.3d 1272, 1287-88 (11th Cir. 2011).  "This is a 'difficult to meet' and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'"  Cullen, 563 U.S. at 181 (quoting Harrington v. Richter, 562 U.S. 86, 102 (2011), and Woodford v. Visciotti, 537 U.S. 19, 24 (2002)).  This Court's review "is limited to the record that was before the state court that adjudicated the claim on the merits."  *Id.*

For claims of ineffective assistance of counsel (IAC), the United States Supreme Court has adopted a two-part test:

First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were

so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Strickland v. Washington, 466 U.S. 668, 687 (1984).  To demonstrate ineffectiveness, a "defendant must show that counsel's performance fell below an objective standard of reasonableness." *Id.* at 688.  To demonstrate prejudice, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*  For this Court's purposes, importantly, "[t]he question 'is not whether a federal court believes the state court's determination' under the Strickland standard 'was incorrect but whether that determination was unreasonable – a substantially higher threshold.'" Knowles v. Mirzayance, 556 U.S. 111, 123 (2009) (quoting Schriro v. Landrigan, 550 U.S. 465, 473 (2007)).  "And, because the Strickland standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Id.*  It is a "doubly deferential judicial review that applies to a Strickland claim evaluated under the § 2254(d)(1) standard." *Id.*

### Ground 1:  Trial Court Error – Prosecutor Eliciting Rebuttal Opinion from Dr. Greg Prichard Regarding Battered Spouse Syndrome

In her first ground, Petitioner Palmer asserts the trial court erred in

overruling defense counsel's objection to the prosecutor eliciting an opinion, on rebuttal, from Dr. Greg Prichard regarding battered spouse syndrome. ECF No. 1 at 9.   Palmer raised this claim in state court as the first point in her direct appeal:  "The trial court erred in overruling defense objection to the prosecutor eliciting an opinion regarding battered spouse syndrome."  Ex. P at i, 13, 15-18.  The First DCA affirmed the case without a written opinion.

As an initial matter, it does not appear that Palmer exhausted this particular ground as a federal claim.  During the trial, when defense counsel objected to Dr. Prichard, defense counsel did not reference federal law.  *See* Ex. J at 1029-31.  Palmer's appellate initial brief cites only state case law, section 90.404, Florida Statutes, and Florida Evidence by Charles Ehrhardt. Ex. P at i, 13, 15-18; *see id.* at ii-iv.  Because Palmer thus did not alert the state courts to the federal ground she now asserts, this ground was not fairly presented as a federal claim and is unexhausted.  *See* Baldwin v. Reese, 541 U.S. 27, 32 (2004) (holding that "ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so"); Preston v. Sec'y, Fla. Dep't of Corr., 785 F.3d 449, 457-58 (11th Cir. 2015) ("The crux of the exhaustion requirement is simply that

the petitioner must have put the state court on notice that he intended to raise a federal claim."); *see also* O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999); Duncan v. Henry, 513 U.S. 364, 365-66 (1995); Picard v. Connor, 404 U.S. 270, 278 (1971).   It is procedurally defaulted because Palmer cannot obtain another direct appeal.   *See* O'Sullivan, 526 U.S. at 845. Palmer has not alleged or shown cause for the default and actual prejudice, nor has she alleged or shown actual innocence or a fundamental miscarriage of justice.   *See id*. at 848-49; *see, e.g.*, Henderson v. Campbell, 353 F.3d 880, 892 (11th Cir. 2003) (explaining cause and prejudice, and correction of fundamental miscarriage of justice); Smith v. Jones, 256 F.3d 1135, 1138 (11th Cir. 2001) ("[I]f the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of just exception is applicable.").

Even assuming Palmer did exhaust this ground, it does not warrant habeas relief.  Palmer essentially raises a claim of state law error, specifically a state trial court evidentiary ruling.  "[F]ederal habeas corpus relief does not lie for errors of state law."  Lewis v. Jeffers, 497 U.S. 764, 780 (1990); *see* Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) (explaining that errors that do not infringe on defendant's constitutional rights provide no basis for federal

habeas corpus relief).   "A state's interpretation of its own laws or rules provides no basis for federal habeas corpus relief, since no question of a constitutional nature is involved."   Carrizales v. Wainwright, 699 F.2d 1053, 1055 (11th Cir. 1983); *accord, e.g.*, McCullough v. Singletary, 967 F.2d 530, 535 (11th Cir. 1992).   "Indeed, the general rule is that a federal court will not review a trial court's actions with respect to the admission of evidence." Shaw v. Boney, 695 F.2d 528, 530 (11th Cir. 1983).   "A state evidentiary violation in and of itself does not support habeas corpus relief" and "[b]efore such relief may be granted, the violation must rise to the level of a denial of 'fundamental fairness.'"   *Id.*; *see* Jacobs v. Singletary, 952 F.2d 1282, 1296 (11th Cir. 1992) ("We review state court evidentiary rulings on a petition for habeas corpus to determine only 'whether the error, if any, was of such magnitude as to deny petitioner his right to a fair trial.' . . . Erroneously admitted evidence deprives a defendant of fundamental fairness only if it was a 'crucial, critical, highly significant factor' in the [defendant's] conviction." (citations omitted)).

Further, a review of the record reflects that admission of the challenged evidence in this case does not appear erroneous under Florida state law.  As Respondent indicates, the testimony at issue occurred when the trial judge overruled defense counsel's objection to the prosecutor eliciting, on rebuttal,

an opinion from Dr. Greg Prichard on battered spouse syndrome.  ECF No. 11 at 31; Ex. J at 1029.

As part of the defense, and as explained in greater detail in the analysis of Grounds 13 and 14, *infra*, Palmer's attorneys had presented Dr. Karla Fischer, an expert in domestic violence.  Ex. J at 915.  Dr. Fischer testified that, in her opinion, Palmer "was a battered woman" but "[s]he does not have battered woman's syndrome."  *Id.* at 925-26.  Dr. Fischer also testified that, in her opinion, Palmer had "a few symptoms of post-traumatic stress disorder that . . . had occurred before the events that led to the stabbing," and Palmer's post-traumatic stress disorder (PTSD) symptoms were "very mild" before the stabbing, but "very strong" after the stabbing.  *Id.* at 937.  Dr. Fischer concluded that Palmer had acted in self-defense when she stabbed the victim: "I believe that the post-traumatic stress disorder symptom patterns, as well as the way that Ms. Palmer described her emotional and cognitive perceptions during the time that she was being attacked by Ms. Washington, I believe that she did act in self-defense, yes."  *Id.* at 938.

In rebuttal, as more fully explained in the analysis of Ground 15, *infra*, the State presented Dr. Prichard as an expert in forensic psychology; defense counsel did not voir dire or object to Dr. Prichard's status as an expert.  Ex. P at 1029.  Defense counsel did object when Dr. Prichard began

testifying, however, because counsel contended battered spouse syndrome

had never been asserted, and was not relevant to, the proceeding:

> [W]e shouldn't be talking about battered spouse syndrome in his
> assessment when it's not asserted and it's not relevant in this
> proceeding.  It never has been.  It's not in our notice.

Ex. J at 1030.   The prosecutor responded and the judge overruled the

defense objection:

> MS. RAY [prosecutor]:  I think if he would have been allowed to
> answer his question initially, my understanding was it was
> battered spouse syndrome.  Everything that he's going to testify
> to, which is going to be pretty limited because I think the jury has
> heard all the information they probably need at this point, goes
> to things that would fall under either category, self defense or
> battered woman syndrome.  This whole defense goes to her
> state of mind, and I'm not going to be asking him anything other
> than issues that went to her state of mind at the time of the killing,
> which is what this case is about.
>
> MR. THOMAS [defense counsel]:  Judge, if I may, he also stated
> on deposition that he was not asked and he did not assess Star
> Palmer for the issue of self-defense.  It's in his deposition.
>
> THE COURT:  And that goes to what issue?
>
> MR. THOMAS:  To – the point is of the relevancy.  He did not
> assess self-defense and all he assessed was battered spouse
> syndrome.  The only thing he can do is what he's done since he's
> been sitting here.
>
> THE COURT:  I'll overrule the objection.
>
> MR. THOMAS:  I'd like a continuing one, Judge.

Ex. J at 1029-31.  Dr. Prichard went on to testify that he met with Palmer twice, spending a total of about three hours with her.  *Id.* at 1032.  He reviewed the police reports, depositions of Dr. Meyer and Dr. Fischer, Dr. Meyer's report, witness statements, medical examiner reports, and the text messages between Palmer and her mother.  *Id.*  Dr. Prichard concluded that battered spouse syndrome symptoms "were not what motivated the crime." *Id.* at 1037.  He further opined that "[i]t did not appear that what motivated the crime was fear, fear or helplessness," which he testified "are essentially the motivators when we talk about self-defense claims."  *Id.* at 1038.  He explained:

> In this case, especially from the transcribed statement with the Tallahassee Police Department, so important because it occurred so close to the time of the, time of the incident. Memories change over time.  Recollections of what occurred may change over time.  But usually the most reliable information is when – around the time of the crime.
>
> In her transcribed statement, she says to Tallahassee Police that she was furious, that she was very angry.  There was one incident when she said she was afraid.  That response was after some prompting by police personnel specifically saying, so it wasn't because you were afraid, and she said, absolutely it was because I was afraid.
>
> However, she would also say, at least twice, that what really ticked me off and what really set me off is that Ms. Washington told her she was a bad parent.  She said, that's the worst possible thing you could say to me.

> So in analyzing those statements, it appeared to me that the motivation from Ms. Palmer, Ms. Palmer stating it, and just kind of the text messages, and the overall context of Ms. Washington telling her to leave and she wouldn't leave, and call the police, somebody is going to have to drag me out of here, it was an anger motivation rather than a fear or helplessness motivation, which for me would be the necessary motivation if we're talking about a self-defense claim or a battered person claim.

*Id.* at 1038-39.  Defense counsel raised another relevancy objection during Dr. Prichard's testimony, and the judge overruled it.  *Id.* at 1037.  Defense counsel thoroughly cross-examined Dr. Prichard.  *Id.* at 1039-53.

Petitioner Palmer has not shown that the state courts' rejection of this ground involved an unreasonable application of clearly established federal law or that it was based on an unreasonable determination of the facts.  See 28 U.S.C. § 2254(d)(1)-(2).   Dr. Prichard's testimony regarding Palmer's symptoms and motivators were relevant to rebut Dr. Fischer's testimony on the same issue presented by the defense.  Thus, if considered on the merits, this ground should be denied.

### Ground 2:  Trial Court Error – Victim Character Evidence

In her second ground, Palmer asserts the trial court erred in overruling the "defense objection to the prosecutor eliciting victim character evidence." ECF No. 1 at 11.  In particular, Palmer takes issue with the prosecutor's questioning of Coach Patrick Cinotte, over defense counsel's objection,

about the "physical nature of basketball" and "how playing the game requires

self control." *Id.* Palmer raised this claim in state court as the second point

in her direct appeal: "The trial court erred in overruling defense objection to

the prosecutor eliciting victim character evidence." Ex. P at i, 13, 19-21. The

First DCA affirmed the case without a written opinion.

As with Ground 1, it does not appear that Palmer exhausted this

ground as a federal claim. During the trial, when defense counsel objected

to Coach Cinotte, defense counsel did not reference federal law. *See* Ex. J

at 1010-11. Palmer's appellate initial brief cites only state statutory and case

law. Ex. P at i, 13, 19-21; *see id.* at ii-iv. Because Palmer thus did not alert

the state courts to the federal ground she now asserts, this ground was not

fairly presented as a federal claim and is unexhausted. It is procedurally

defaulted because Palmer cannot obtain another direct appeal. Palmer has

not alleged or show cause for the default and actual prejudice, nor has she

alleged or shown actual innocence or a fundamental miscarriage of justice.

Even assuming Palmer did exhaust this ground, it does not warrant

habeas relief. As with Ground 1, Palmer here essentially raises a claim of

state law error, specifically a state trial court evidentiary ruling. "[F]ederal

habeas corpus relief does not lie for errors of state law." <u>Lewis</u>, 497 U.S. at

780; *see* <u>Estelle</u>, 502 U.S. at 67-68. "Indeed, the general rule is that a federal

court will not review a trial court's actions with respect to the admission of evidence."  Shaw, 695 F.2d at 530.

Further, a review of the record reflects that admission of the challenged evidence in this case does not appear erroneous under Florida state law. The prosecution called Coach Patrick Cinotte as part of its rebuttal.  Ex. J at 1007.  Coach Cinotte was the head basketball coach at Illinois Valley Community College during the two years the victim, Shannon Washington, played there.  Id.  Cinotte testified regarding the important qualities for a good basketball player and stated that "[e]ducation is number one."  Id. at 1008. He testified the "[s]econd thing is personality, to make sure she's definitely going to be a great fit . . . [b]ecause in our basketball program, we are a family."  Id. at 1009.  He testified that basketball is a "physical sport" and "you have to play hard."  Id.  The following then occurred on the record during the prosecutor's questioning of Cinotte, including defense counsel's objection:

> Q  Okay.  Does personality at all factor into the physical part of basketball when you're talking about basketball players?
>
> A  Yes, to an extent.
>
> Q  Okay.  I mean, does it require some kind of self control by the player when they're –
>
> MR. THOMAS [defense counsel]:  Judge, can we go sidebar, please.  I have an objection to lodge.

THE COURT:  Okay.  Let's go sidebar.

(Private bench conference as follows:)

THE COURT:  Yes, sir.

MR. THOMAS:  Judge, I have two objections.  The first one is this is basically victim impact testimony is what it is.  And number two, apparently, she's putting on reputation for peacefulness efforts, if I'm understanding this correctly, and I object to both of those.

THE COURT:  Well, what's your theory of why they can't get into peacefulness?

MR. THOMAS:  Because this is, what's going to come out is she played basketball.  When she got elbowed she didn't hit anybody.  That has nothing to do with what we're talking about here.  Unless he's observed some type of physical altercation, true altercation where Shannon stood down, it's not relevant.

THE COURT:  I'll overrule the objection.

(End of private bench discussion.)

BY MS. RAY:

Q  You can answer the question. . . . So I was asking you, it's a physical sport.  Does it require the players to have some sort of self-control?

A  Absolutely, I mean, every game.  We are entirely in the country, and everybody was shooting for us.  And any time that you're rated that high, everybody wants to try to get on your nerves, you know.  I mean, every time – Shannon was one of the best players in the country, so I mean, there was people gunning for her, you know.  She controlled herself unbelievably.

*Id.* at 1010-11.  Cinotte further testified that he knew Washington "[v]ery well,"

he spent a lot of time with the players, and Washington "actually spent the

first month and a half at [his] house until she got a place to live."  *Id.* at 1011-

12.  He knew Washington was in a "relationship with a lady down here in

Florida" and he knew Palmer.  *Id.* at 1012-13.  He testified:

> They both have eaten at my house.  We have given them rides
> back and forth to the college.  They have spent afternoons at my
> house watching TV, playing with my three kids.  So, I mean, yes,
> they were, you know, at our house quite a few times.

*Id.* at 1014.  He further testified:

> Q  In the time that you knew the defendant and spent time with
> them, did you ever get any indication that the defendant wasn't
> free to do what she wanted to do while she was there?
>
> A  No.
>
> . . . .
>
> Q  Did you ever see any verbal altercations or were you ever
> present with any verbal altercations between the defendant and
> Ms. Washington?
>
> A  They argued.  I never seen any hands on at all.

*Id.* at 1014-15.  Defense counsel cross-examined Coach Cinotte.  *Id.* at

1015-20.

Based on the foregoing, nothing indicates the trial judge abused his

discretion in allowing this rebuttal testimony.  The defense had presented

testimony in its case that Washington had been more aggressive in physical altercations with Palmer. *See* Ex. G at 508-20, 543-48, 562-66; Ex. H at 784-812, 855-56, 873.

Petitioner Palmer has not shown that the state courts' rejection of this ground involved an unreasonable application of clearly established federal law or that it was based on an unreasonable determination of the facts. See 28 U.S.C. § 2254(d)(1)-(2). If considered on the merits, this ground should be denied.

**<u>Ground 3</u>: Trial Court Error – Untimely Disclosed Prejudicial Evidence**

In her third ground, Palmer asserts "[t]he trial court erred in denying the defense motion to exclude untimely disclosed prejudicial evidence." ECF No. 1 at 12. In particular, Palmer takes issue with the trial court ruling after the hearing held pursuant to <u>Richardson v. State</u>, 246 So. 2d 771 (Fla. 1971), allowing the prosecution to use text messages she sent to her mother the day of the murder, where the prosecution did not disclose the messages until after the initial jury selection even though the prosecution had the cell phone for almost two years. *See id.*; *see also* Ex. P at 13-14. Palmer raised this claim in state court as the third point in her direct appeal: "The trial court erred in denying the defense motion to exclude untimely disclosed prejudicial

evidence." Ex. P at i, 13-14, 22-27. The First DCA affirmed the case without a written opinion.

As with Grounds 1 and 2, it does not appear that Palmer exhausted this ground as a federal claim. As explained in detail, *infra*, during the Richardson hearing in the trial court, defense counsel made no argument citing federal law. Palmer's appellate initial brief cites only state rules and case law. Ex. P at i, 13-14, 22-27; *see id.* at ii-iv. Because Palmer thus did not alert the state courts to the federal ground she now asserts, this ground was not fairly presented as a federal claim and is unexhausted. It is procedurally defaulted because Palmer cannot obtain another direct appeal. Palmer has not alleged or shown cause for the default and actual prejudice, nor has she alleged or shown actual innocence or a fundamental miscarriage of justice.

Even assuming Palmer did exhaust this ground, it does not warrant habeas relief. As with Grounds 1 and 2, Palmer here essentially raises a claim of state law error, specifically a state trial court's interpretation of Rule 3.220 of the Florida Rules of Criminal Procedure and its evidentiary ruling. "[F]ederal habeas corpus relief does not lie for errors of state law." Lewis, 497 U.S. at 780; *see* Estelle, 502 U.S. at 67-68. "Indeed, the general rule is

that a federal court will not review a trial court's actions with respect to the admission of evidence." Shaw, 695 F.2d at 530.

As Respondent indicates, the issue arose as the trial was set to begin on July 9, 2013. *See* ECF No. 11 at 47. The jury had been selected the day before, and then defense counsel indicated she had been "informed by the State that a cellphone of Ms. Palmer's that they have had in their possession for two years contains text messages from Ms. Palmer's phone to her mother that they intend to introduce at the trial in this case that was scheduled to begin tomorrow – introduce it in trial as to Ms. Palmer's intent." Ex. A at 162. Defense counsel indicated "[o]n the surface they appear without having – being able to evaluate them, they appear to be highly incriminating." *Id.* Defense counsel went on to argue:

> Obviously, under Florida Rule Criminal Procedure . . . 3.220, the substance of any statements allegedly made by the defendant, the State is obligated to provide those to us. Text messages are akin to oral statements and considered omissions. I would cite to Symonette v. State, 100 – 100 So. 3d 180.
>
> Obviously, I would argue that the disclosure after we have selected a jury in this case is per se untimely, and so we are asking for a Richardson inquiry.

*Id.* at 162-63. The trial court then conducted a Richardson hearing. *Id.* at 163.

The Florida Supreme Court has explained a Richardson hearing:

> Where the exclusion of evidence or other sanction is sought because of a discovery violation, Richardson holds that the trial court's discretion can be properly exercised only after an adequate inquiry is made into three areas: (1) whether the discovery violation was willful or inadvertent; (2) whether it was trivial or substantial; and (3) whether it had a prejudicial effect on the opposing party's trial preparation.

McDuffie v. State, 970 So. 2d 312, 321 (Fla. 2007) (quoting Richardson, 246 So. 2d at 775). "Prejudice in this context means procedural prejudice significantly affecting the opposing party's preparation for trial." *Id.*

At the start of the Richardson hearing in this case, the prosecutor asserted the State had been in possession of Palmer's cellphone since September 4, 2011, when it was impounded. *Id.* The prosecutor explained, "[W]e initially responded to discovery in this case on October 25th of the year 2011, and the first amendment that was made – or an amendment that was made to the discovery, there were multiple ones, but the one that was done on February 1st of the year 2012, specifically listed and provided the defense with copies of the property receipts," and those "property receipts clearly indicate that there were actually three cellphones that were impounded." *Id.* She further explained that "[t]wo of the cellphones were on the victim's bed and were documented with digital photography, that was also provided to the defense way back to the beginning of this case" and the third phone, which

was found in the hallway, "was determined to belong to one of the roommates." *Id.* She continued:

> So, the defense has been on notice that we've had the defendant's cellphone since September – well, at least if they didn't know before, based on something I'm going to mention in a moment, they at least knew since February 1st of the year 2012, when they were provided with copies of the property receipts.
>
> During the defendant's interview with the police that was provided with – a long time ago in discovery there is a discussion between Investigator Beck and the defendant where the defendant is urging the investigator to look at her phone. She's talking about conversations that she was having with her mother and urging the law enforcement to look at her phone. So I would suggest that that certainly puts the defense on additional notice, even prior to being provided with property receipts that the defendant's cellphone was in the possession of law enforcement, they never went, I guess, and looked at any of the evidence that was in the custody of the Tallahassee Police Department.

*Id.* at 164. The prosecutor explained that after the jury selection, and in preparation for the start of the trial, she asked her investigator to pull all the physical evidence "[a]nd in preparing to mark[] them, I asked the investigator to power up the defendant's phone." *Id.* at 165. She continued:

> We saw there was an outbox with messages and my investigator opened the outbox and looked at the messages that were sent to the defendant's mother in this case. The messages that defense counsel is referring to is there is one that the defendant sent at 1:38 a.m. on September 4th of the year 2011. It says, I love you, mom. I'm sorry.
>
> At 1:40 –

THE COURT:  Remind me of the date and time of the offense.  I know you would have it in your head.

MS. RAY:  Yes, I'm sorry.  September 4th of the year 2011, 911 was called at 2:03 a.m.  It was shortly before that the victim was stabbed by the defendant.

So, at 1:38 the text message, I love you, mom.  I'm sorry.

There is another message that the defendant sent to her mother at 1:43 a.m.  It says, This is it for me, mom.  I'm going to kill her tonight and I don't care what the night going to be like.

There's a third message that the defendant sent to her mother at 1:47 a.m.  You're going – you're gone have to visit me in jail, mom.  I'm so sorry, but I have to show her.  And then there's three text messages or four that the mom was responding to her.  And that's the subject of what defense counsel is referring to.

I, obviously, didn't know they were there prior to yesterday. They do provide inculpatory evidence against the defendant, I agree, but I don't believe it's any Richardson violation.  The phones have been available.  They chose not to look at them. It's a self-defense case, so, I mean, that's another issue, I guess. But the phones have been available and I don't believe that it's a discovery violation on behalf of the State.

*Id.* at 165-67.

Defense counsel responded that she agreed "there was some discussion in the interrogation that Ms. Palmer suggested to the – to the lead investigator . . . kind of almost imploring him to – she's saying what the substance of the text messages and conversations are. . . . [a]nd says, It's

all in my phone, suggesting that there is nothing incriminating in there." *Id.*

at 167.  Defense counsel continued:

> So, there was no reason for us to go seize a phone.  It would be kind of logical.  It's not our obligation to do the State's investigation.  It's reasonable for us to – to conclude and proceed with our evidence that the substance of the statements are precisely what Ms. Palmer said in her interrogation.  And so, if they were exculpatory, they would have been provided to us.
>
> And under 3.220(b) they are under the specific obligation to timely disclose the substance of any statements.  So, these are specifically addressed in the discovery rules.  That is a discovery violation. . . .
>
> The key question here is whether it had a prejudicial effect on our trial preparation.  Obviously, this materially hindered our trial preparation and strategy.  As Ms. Ray – well, as Your Honor is well aware of, because we picked a jury of yesterday, we have – we have prepared a self-defense case.  I picked a jury on a self-defense theory based on the evidence that was before me.  And, Your Honor, I will note for the record that I did not inquire of this jury panel at all about premeditation and that was a strategic decision on my part based on the evidence that we had before us.
> So, I believe – and, again, it's per se after we pick a jury untimely.  And it is a discovery violation under 3.220.  They are – have an affirmative obligation to provide us with statements.  We are under no obligation to seek them out.  And just because there was a property receipt that said there was a cellphone in there they did not put us on any notice that there was any inculpatory evidence and we're under no obligation to go to TPD and ask to view their evidence.

*Id.* at 167-69.  Defense counsel asked the judge to exclude the evidence.  *Id.*

at 169.  The judge asked defense counsel what she would request if he is

"not inclined to exclude it," and she answered that "then we are going to have

to request a continuance."  *Id*. at 170.

The judge denied the request to exclude the evidence and granted a

continuance of the trial, explaining his decision on the record:

> Well, it doesn't appear to me there has been a discovery
> violation, but I would be quick to say that exactly where that line
> is, is not overly clear.  Given the – my knowledge of the discovery
> cases as to exactly what constitute a violation, and it does not
> appear to me to be somewhat of an admission – moving target,
> depending on the circumstances.

> It certainly, based upon what has been presented, was not
> a willful violation.  On the other hand, it certainly does appear to
> be a game changer to some extent, given what has been
> represented here.  And that, of course, you all just – just got it,
> so maybe, maybe that changes.  But it certainly is significant
> evidence.

> I'm, certainly under those circumstances, not going to
> exclude the evidence, but I can see why the defense feels caught
> a little short on having to deal with this new, what at least on its
> face, could be very incriminating evidence.  I'm not oblivious also,
> but we have not sworn the jury and each side still has enough
> strikes that they could exhaust the panel as it stands.  And I don't
> want to put the attorneys in a posture of having to resort to tactics
> of that nature to obtain a continuance.

> So, you know, while I detest the idea of wasting four days
> of trial time that we had done in prolonging this longer, I think the
> appropriate remedy is to continue the trial, give the defense an
> opportunity to look further into it as to how it fits into their defense
> strategy, and whether it's legally admissible or not.  I know that
> creates an inconvenience for many people, but I don't – I don't
> see another good remedy to solve this.

*Id.* at 171-72.  The judge thus found if a discovery violation had occurred, it was not willful, it was substantial, and it prejudiced the defense's trial preparation.  Accordingly, the judge granted defense counsel's request to continue the trial.

Based on the foregoing, nothing indicates the trial judge abused his discretion or otherwise erred in his ruling.  *See, e.g.*, Miller v. State, 636 So. 2d 144, 149 (Fla. 1st DCA 1994) ("A trial court's ruling on whether exclusion is an appropriate sanction for a discovery violation is discretionary, and should be disturbed on appeal only upon a clear showing of abuse.").  Any prejudice from the delayed disclosure of the texts was "extinguished when the trial [was] continued."  State v. Rodriguez, 907 So. 2d 564, 565 (Fla. 3d DCA 2005) ("If the discovery material and information comes too late to permit the trial to proceed as scheduled, the prejudice is extinguished when the trial is continued.  Thus, it is manifest that whatever prejudice to a defendant's ability to defend against the charges may be said to arise from a delay in providing him with discovery is cured when he is provided with such discovery, and there is no other impediment to his utilizing it in the preparation of his defense.").

Petitioner Palmer has not shown that the state courts' rejection of this ground involved an unreasonable application of clearly established federal

law or that it was based on an unreasonable determination of the facts.  See 28 U.S.C. § 2254(d)(1)-(2).  Thus, if considered on the merits, this ground should be denied.

**Ground 4:  Trial Court Error – Jury Instruction on
Justifiable Use of Non-Deadly Force**

In her fourth ground, Palmer asserts fundamental error occurred as to the jury instruction on justifiable use of non-deadly force.  ECF No. 1 at 14.  Palmer asserts that because her "defense was self-defense with a knife, rather than a deadly weapon as a matter of law she was entitled to a proper instruction on justifiable use of non-deadly force."  *Id.*

Palmer raised this claim in state court as the fourth point in her direct appeal:  "The jury instruction on justifiable use of non-deadly force negated appellant's right to use non-deadly force against unlawful force and constituted fundamental error."  Ex. P at i, 14, 28-34.  In her appellate brief she argued the judge instructed the jury pursuant to the standard jury instructions on justifiable use of deadly force and justifiable use of non-deadly force, and the justifiable use of non-deadly force instruction conveyed to the jury that use of such force was not justifiable unless Palmer believed it was necessary to defend herself against being killed or severely injured.  *See* Ex. P at 14.  She asserts fundamental error occurred because the jury

could have found her guilty even if they believed her defense that the victim was the aggressor and that she used non-deadly force against unlawful force.  *See* Ex. P at 14.  The First DCA affirmed the case without a written opinion.

As with Grounds 1 and 2, it does not appear that Palmer exhausted this ground as a federal claim.  Palmer's appellate initial brief cites only state rules and case law.  Ex. P at i, 14, 28-34; *see id*. at ii-iv.  Because Palmer thus did not alert the state courts to the federal ground she now asserts, this ground was not fairly presented as a federal claim and is unexhausted, and it is procedurally defaulted.  Palmer has not alleged or shown cause for the default and actual prejudice, nor has she alleged or shown actual innocence or a fundamental miscarriage of justice.

Even assuming Palmer did exhaust this ground, it does not warrant habeas relief.  As Respondent indicates, alleged errors in state court jury instructions do not provide a basis for federal habeas relief unless the instructions infect the entire trial and result in a denial of due process.  *See* Estelle, 502 U.S. at 71-72.  Trial judges have wide discretion in decisions concerning jury instructions.  *See, e.g.*, James v. State, 695 So. 2d 1229, 1236 (Fla. 1997).  "The standard jury instructions are presumed correct and

are preferred over special jury instructions." <u>Stephens v. State</u>, 787 So. 2d 747, 755 (Fla. 2001).

Here, the trial court instructed the jury on justifiable use of deadly force and justifiable use of non-deadly force. Ex. A at 99-102. "Non-deadly" force was defined as "force not likely to cause death or great bodily harm." *Id.* at 101. The jury was instructed on the two elements necessary to find Palmer was justified in using non-deadly force:

> Defendant would be justified in using non-deadly force against Shannon Washington if the following two facts are proved:
>
> 1. Defendant must have reasonably believed that such conduct was necessary to defend herself against victim's imminent use of unlawful force against the defendant.
>
> 2. The use of unlawful force by victim must have appeared to defendant to be ready to take place.

*Id.* at 101. The instruction then provided:

> If the defendant was not engaged in an unlawful activity and was attacked in any place where she had a right to be, she had no duty to retreat and had the right to stand her ground and meet force with force, including deadly force, if she reasonably believed that it was necessary to do so to prevent death or great bodily harm to herself or to prevent the commission of a forcible felony.

*Id.*

The trial court used the standard jury instruction 3.6(g) on justifiable use of non-deadly force, which is based on section 776.013(3), Florida Statutes (2011).  Palmer evidently takes issue with the placement of the comma after "deadly force," as that comma does not appear in the statute. *See* Ex. P at 29-30; Talley v. State, 106 So. 3d 1015, 1017 (Fla. 2d DCA 2013) (explaining that the additional comma after "deadly force" is "erroneous because under the rules of grammatical construction it makes the phrase 'including deadly force' a nonessential part of the sentence and thus changes the meaning by indicating that a defendant has no duty to retreat and has the right to stand his ground and meet force with force *only if* he reasonably believed that it was necessary to do so to prevent death or great bodily harm to himself or to prevent the commission of a forcible felony").  *Cf.* Sims v. State, 140 So. 3d 1000, 1004-05 (Fla. 1st DCA 2014) (agreeing with Talley decision "that the standard jury instruction for justifiable use of non-deadly force is grammatically flawed and that the extra comma erroneously narrows the scope of the defense" but explaining "we do not find the error to be fundamental error in this case" where "viewed as a whole, the jury instructions properly advised the jury on the issue of self-defense" and where Appellant "was not even entitled to assert the defense" provided in section 776.013(3) as "at the time he used force to defend himself against Perkins'

alleged unprovoked attack, Appellant was no longer in a place he was entitled to be and was engaged in unlawful activity (i.e., trespassing)").

Importantly, in this case, not only was there no objection to the jury instruction at issue, but defense counsel affirmatively requested and accepted the instruction on justifiable use of non-deadly force. *See, e.g.*, Singletary v. State, 829 So. 2d 978, 979 (Fla. 1st DCA 2002) (explaining "affirmative waiver" occurred where defense counsel "not only failed to object to the instruction, but actually agreed to it, specifically acknowledging that he had no objections" to jury instruction that included non-existent element of defense). *See also* State v. Floyd, 186 So. 3d 1013, 1023 (Fla. 2016) ("Floyd's failure to object or raise concerns belies his contention that the instructions were confusing, misleading, or contradictory. A failure to raise a concern or object is an indication that Floyd's counsel did not perceive a problem."). In particular, defense counsel requested an instruction on self-defense, and the trial judge allowed the instructions on justifiable use of deadly force and justifiable use of non-deadly force, as requested by defense counsel. *Id.* Ex. I at 885-99.

The defense received the instruction it requested on justifiable use of non-deadly force, and defense counsel indicated to the judge there were no other issues regarding the self-defense instruction. *Id.* at 899. The judge

asked twice more whether any issues existed with the jury instructions, and defense counsel responded "none" both times.  *Id.* at 1057, 1059-60, 1128. *See* Floyd, 186 So. 3d at 1023 (explaining defense counsel discussed jury instructions, repeatedly agreed to instructions, played active role in tailoring instructions and "[d]espite this extensive participation in the tailoring of the jury instructions, Floyd's counsel never once raised any concern or objected regarding the interplay between the 'Stand Your Ground' language and the 'Initial Aggressor' language").  If any error existed in the instruction, defense counsel requested and agreed to that instruction, and thus waived any such error.  *See, e.g.*, Calloway v. State, 37 So. 3d 891, 896-97 (Fla. 1st DCA 2010) (affirming conviction where "defendant requests we reverse a verdict even though the trial court read a standard jury instruction the defendant expressly agreed to on two separate occasions," explaining "the defendant did not object to the instruction he argues was so faulty that it 'reached down into the validity of the trial'," and "defendant specifically agreed to the instructions and stated he had no objections to them as proposed and as read").

Further, even assuming the trial court erred in giving the instruction at issue, "the fact that [a jury] instruction was allegedly incorrect under state law is not a basis for habeas relief."  Estelle, 502 U.S. at 71-72.  "The only

question for us is 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'" *Id.* at 72. (quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973)); *see* Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974) (explaining "it must be established not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some [constitutional] right" (quoting Cupp, 414 U.S. at 146)).

Nothing indicates "the ailing instruction by itself so infected the trial" that Palmer's resulting conviction violates due process. *See* Estelle, 502 U.S. at 71-72. The jurors found Palmer guilty of first degree premeditated murder. Ex. A at 108. The jurors thus found Palmer had a premeditated intent to kill Washington and did not act in self-defense.

Petitioner Palmer has not shown that the state courts' rejection of this ground involved an unreasonable application of clearly established federal law or that it was based on an unreasonable determination of the facts. See 28 U.S.C. § 2254(d)(1)-(2). Thus, if considered on the merits, this ground should be denied.

## Ground 5:  IAC – Allowing Trial by Six-Person Jury

In her fifth ground, Palmer asserts defense counsel provided ineffective assistance by allowing her to be tried and convicted by a six-

person jury, rather than a twelve-person jury as required by statute in all capital cases. ECF No. 1 at 16. Palmer asserts that neither she nor defense counsel waived her right to trial by a twelve-person jury. *Id.*

Palmer exhausted this ground by raising it as the first claim in her amended Rule 3.850 motion. Ex. S at 21-23. The state post-conviction trial court denied the claim, making the following findings on the record at the conclusion of the evidentiary hearing:

> As to Ground One, the six-person versus the 12-person jury, I agree with what Mr. Thomas said; that at the time of this case, that law was confused. If you go back and read the Griffin case from the Supreme Court, it did appear to have resolved the issue, but then there were subsequent to that, First DCA cases and other DCA cases that came up with a different result. The law was in flux.
>
> I would agree that at that point in time it was not clear what the law was on six-person, 12-person juries when the State had waived the death penalty.
>
> As an aside, I'm not sure that that law isn't now in question given a change in the law. It is a statutory determination, not a constitutional determination. I'm not positive with the new change in the death penalty law that we don't have a different result.
>
> But anyway I think the law is clear, and that aside, I shouldn't have thrown that in, but that was just something that's on my mind.
>
> I think the law is pretty clear that at this point in time that a person is entitled to a 12-person jury unless the death penalty is legally impossible, not just that the – not just that the State has

waived it.  However, that was not the case in 2014.  I do not think it was ineffective assistance of counsel not to assert that she was entitled to a 12-person jury.  That ruling can be argued.

However, I think the Smith case, which is, based upon my research, still controlling law, 857 So. 2d 268, Fifth DCA, with facts almost on point with what we have here.  And, frankly, if you read Smith, probably the Court should not have conducted an evidentiary hearing on this case because there is no prejudice, and that's what the Smith case found on facts very similar to what we have here.  Therefore, the really clear ruling is that that motion is denied because there was no prejudice.

Ex. S at 206-08.  The judge further found on the record that Palmer had

waived any argument concerning a twelve-person jury:

Go back to Ground One.  Just one comment that I had made a note here I want to comment on.

I didn't mention Ms. Palmer did specifically waive a 12-person jury, and it was brought up in front of her at least three other times.  We actually picked a six-person jury and then excused them.  She was well aware that there was an issue between 12 and six-person jury.

As I've said, I don't think it was ineffective assistance of counsel for counsel to agree to a six-person jury.  As I've said, Ms. Ray and Ms. Copek worked closely in this case.  It's to some extent speculation, but it's speculation on the prejudice side too that they should have had a 12-person jury.

I don't know what position the prosecutor would have taken had the defense started asserting that they needed a 12-person jury.  Most of these cases, it's actually stated on the record that it's – the State's waiving the death penalty to get the defense to agree to a six-person jury.  That was never made of record, and unfortunately we can't have Ms. Ray to give her side of the story.  But I think there is certainly a potential that had the defense

asserted for a 12-person jury, Ms. Ray would have asserted that
then the death penalty should be on the table. But, anyway, I've
made my ruling.

*Id.* at 211-12.

On appeal, the First DCA affirmed the state post-conviction court's
order without a written opinion. Ex. Y. The First DCA's summary affirmance
is an adjudication on the merits entitled to deference under 28 U.S.C.
§ 2254(d). *See* <u>Richter</u>, 562 U.S. at 99 ("When a federal claim has been
presented to a state court and the state court has denied relief, it may be
presumed that the state court adjudicated the claim on the merits in the
absence of any indication or state-law procedural principles to the
contrary."). A review of the record supports the state courts' determination.
*See* <u>Wilson v. Sellers</u>, -- U.S. --, 138 S. Ct. 1188, 1192 (2018) ("We hold that
the federal court should 'look through' the unexplained decision to the last
related state-court decision that does provide a relevant rationale. It should
then presume that the unexplained decision adopted the same reasoning.").

In particular, Palmer testified at the evidentiary hearing, during cross-
examination, that she was informed of her right to a twelve-person jury and
she had agreed to a six-person jury instead:

Q Okay. Ms. Palmer, isn't it true that on that date [July 8, 2013,]
the Court informed you that you had the right to a six-person – to

a 12-person jury and then asked you whether you were agreeing
to the six-person jury and you said yes?

A  Yes, sir.

Q  Okay.  So you were informed?

A  I was, sir.

Q  And you agreed to do a 12 – or a six-person jury; right?

A  Yes, sir.

Ex. S at 142.  Indeed, during the first jury selection, on July 8, 2013, the

following transpired on the record:

THE COURT [Judge Hankinson]:  And we will pick that jury this
morning.  Anything else we need to discuss on that one?

MS. RAY:  No, sir.

THE COURT:  Now, we are picking a 12 person or a six person
jury?

MS. COPEK:  A six person.

THE COURT:  All right.  And Ms. Palmer has agreed to that?

MS. COPEK:  Yes, Your Honor.

THE DEFENDANT:  Yes, sir.

. . . .

THE COURT:  All right.  Ms. Palmer, arguably you are entitled to
a 12 person jury.  Do you understand you're agreeing to a six
person jury?

THE DEFENDANT:  Yes, sir.

Ex. B at 4.

"Florida statutory law provides that a defendant charged with a capital crime[, such as first degree murder,] is entitled to a twelve-person jury (whether or not the death penalty is sought), and may be tried by a jury of only six when the defendant waives that right."  Cabberiza v. Moore, 217 F.3d 1329, 1333 (11th Cir. 2000); see Williams v. Florida, 399 U.S. 78 (1970); State v. Poole, So. 2d 535, 535 (Fla. 1990) ("[R]egardless of whether the state seeks the death penalty, a twelve-person jury is required in first-degree murder trials unless waived by the defense."); State v. Griffith, 561 So. 2d 528, 529 (Fla. 1990) ("Because Griffith was indicted for first-degree murder, which may be punished by death, and for which the legislature prescribed a twelve-person jury, Griffith is entitled to a trial by a twelve-person jury unless that right is waived jointly by the state and the defense."); see also, e.g., Hall v. State, 853 So. 2d 546, 548-49 (Fla. 1st DCA 2003); Smith v. State, 857 So. 2d 268, 269-70 (Fla. 5th DCA 2003).  In particular, article I, section 22 of the Florida Constitution guarantees a criminal defendant's right to a jury trial consisting of "not fewer than six" jurors, and section 913.10, Florida Statutes, provides that "[t]welve persons shall

constitute a jury to try all capital cases."  *See* Fla. R. Crim. P. 3.270.  "The significance of the form of enactment is that a criminal defendant's constitutional right to a jury trial with six jurors is fundamental in nature, and a criminal defendant's statutory right to a twelve-person jury in a capital case is not fundamental."  <u>Smith</u>, 857 So. 2d at 270.

The Eleventh Circuit has determined that a Florida defendant charged with first degree murder did not suffer prejudice by his attorney's agreement to a six-person jury, explaining "we cannot take judicial notice that a jury of twelve is always better for a defendant than six" as "[t]he likelihood of achieving a hung jury is but one factor an attorney would consider" along with "other facts specific to the case, like the make-up of the venire, the identity of the defendant and/or the victim(s), the strength of the state's case, the cost to the defendant of a retrial, and so on."  <u>Cabberiza</u>, 217 F.3d at 1335-36; *see* <u>Williams</u>, 399 U.S. at 100-02.  Similarly, as the state post-conviction judge here explained, Palmer cannot show prejudice by any tactical determination or advice by defense counsel to allow her to be tried by a six-person jury, rather than a twelve-person jury.  *See* <u>Cabberiza</u>, 217 F.3d at 1335-36; <u>Smith</u>, 857 So. 2d at 270-71.

Regardless, as indicated in the above excerpt, the trial judge in this case actually informed Palmer that she was "arguably" entitled to a twelve-

person jury, and she still affirmatively agreed to a six-person jury, thereby effectively waiving that right.  *See* <u>Griffith</u>, 561 So. 2d at 30 (explaining that decision to proceed with jury of only six people "must be considered a tactical decision" and "a defendant's personal on-the-record waiver" is "unnecessary for a waiver to be effective":  "Although the record lacks Griffith's personal waiver of his statutory right to trial by a twelve-person jury, it indicates that Griffith's counsel, the state, and the court discussed the matter.  Griffith should not now be heard to complain." (footnote omitted)); *cf.* <u>Smart v. State</u>, 695 So. 2d 448, 449 (Fla. 1st DCA 1997) ("The defendant was not present when the waiver [of the twelve-person jury] was announced by counsel, and because the defendant repudiated the waiver and objected to a six-person jury before the panel was sworn, we conclude that the trial court erred in allowing the case to proceed to trial by a six-person jury.").

Based on the foregoing, Petitioner Palmer has not shown that the state courts' adjudication of this ground involved an unreasonable application of clearly established federal law or that it was based on an unreasonable determination of the facts.  *See* 28 U.S.C. § 2254(d)(1)-(2).  Under the double deferential review this Court applies to a <u>Strickland</u> claim evaluated pursuant to the § 2254(d)(1) standard, this ground should be denied.

## Ground 6:  IAC – Prosecutor's Statements on Sudden Provocation

In her sixth ground, Palmer asserts defense counsel provided ineffective assistance by not objecting when the prosecutor misstated the law on sudden provocation and incorrectly defined sudden provocation during closing argument.  ECF No. 1 at 16.  Palmer exhausted this ground by raising it as the second claim in her amended Rule 3.850 motion.  Ex. S at 24-30.  The state post-conviction trial court denied the claim, making the following findings on the record at the conclusion of the evidentiary hearing:

> Ground Two, as to the closing argument, Ms. Ray contended in closing argument that the sudden provocation, heat-of-passion defense did not apply to manslaughter.  That is what I ruled during the jury instruction – in the charge conference.  That is what I ruled.  Whether that was legally wrong or not, that was something to be taken up with the Appellate Court, but Ms. Ray was not stating something that was incorrect based upon the rulings that I made.

> My ruling was that the heat of passion did not apply to manslaughter.  I think it was not – I do not find that it was ineffective to fail to object to that argument.  Frankly, I think it was a correct statement of the law, but even if it was not a correct statement of the law, it was not ineffective to fail to object.

> More clearly I guess on the prejudice side, Ms. Palmer was found guilty of first-degree murder; so whatever Ms. Ray may have said about the effect of that instruction on manslaughter is irrelevant.  It's two steps removed from the conviction in this case, and, therefore, I think clearly there was no prejudice.

Ex. S at 208-09.  On appeal, the First DCA affirmed without an opinion, an

adjudication on the merits entitled to deference under 28 U.S.C. § 2254(d).

*See* Richter, 562 U.S. at 99.   The record supports the state courts'

determination.  *See* Wilson, 138 S. Ct. at 1192.

Specifically, the prosecutorial comment at issue occurred during

closing:

> This is not a case of manslaughter, ladies and gentlemen.
> *The sudden provocation does not apply to manslaughter*, but I
> would suggest to you that sudden provocation is not an issue in
> this case at all, as it relates to first degree or second degree
> murder.
>
> Sudden provocation of the sort that would arouse strong
> emotions in an ordinary, reasonable person caused the
> defendant to be overcome with such strong emotion that she was
> not able to act with premeditation or depraved mind.  That's
> walking into a bedroom, seeing your husband in bed with another
> woman, having sex in your bed.  You don't think about it, you get
> a gun, a knife, you stab somebody, you shoot somebody.  That's
> what the instruction means, ladies and gentlemen.
>
> You don't get to text your mother 20 minutes before.  You
> don't get to arm yourself a period of time before and say you're
> going to kill somebody and then use the excuse that I was just
> out of my mind and blame it on the victim.  Blame it on the dead
> woman who cannot speak for herself.

Ex. K at 1124-25 (emphasis added).  As the post-conviction trial court judge

determined, the prosecutor's comment that the sudden provocation/heat-of-

passion defense did not apply to manslaughter, is consistent with what he had ruled during the jury instruction charge conference.

In particular, during the charge conference, the defense had requested a heat-of-passion instruction pursuant to Villella v. State, 833 So. 2d 192, 195 (Fla. 5th DCA 2002), and Palmore v. State, 838 So. 2d 1222 (Fla. 1st DCA 2003), Ex. A at 35, and discussion occurred among counsel and the judge regarding where to place the instruction, Ex. I at 879-83.  The judge explained that, given the involvement of a knife in this case, the heat-of-passion argument would not "be a complete bar, but it could be . . . a defense to first degree murder and second degree murder."  Ex. I at 882.  The judge suggested putting the instruction after the instructions on first and second degree murder, and defense counsel agreed "that's an appropriate placement" as "[i]t says that it's a defense to both first and second degree murder."  Id. at 883.  Accordingly, after the instruction on second degree murder and before the manslaughter instruction, the judge instructed the jury:

> In considering whether the evidence has proved premeditation as to first degree murder or depraved mind as to second degree murder, you may also consider whether a sudden provocation of the sort that would arouse strong emotions in an ordinary reasonable person caused the defendant to be overcome with such strong emotion that she was not able to act with premeditation or depraved mind.

Ex. A at 97; *see* Ex. K at 1069.

The trial court did not err in its ruling and defense counsel cannot be ineffective for not raising a futile issue. If defense counsel had objected, the judge would have overruled the objection. *See, e.g.,* Card v. Dugger, 911 F.2d 1494, 1520 (11th Cir. 1990) ("Counsel cannot be labeled ineffective for failing to raise issues which have no merit.").

Moreover, as the post-conviction court further concluded, Palmer has not shown any prejudice. The jury found her guilty of first-degree premeditated murder and, thus, any comments about the heat-of-passion argument as it relates to manslaughter do not appear relevant.

Based on the foregoing, Palmer has not shown that the state courts' adjudication of this ground involved an unreasonable application of clearly established federal law or that it was based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(1)-(2). Under the double deferential review this Court applies to a Strickland claim evaluated pursuant to the § 2254(d)(1) standard, this ground should be denied.

### Ground 7(a): IAC – Failure to Move for Mistrial

In the first part of Ground 7, Palmer asserts defense counsel provided ineffective assistance by not moving for a mistrial based on the prosecutor's

statements concerning heat-of-passion/sudden provocation.  ECF No. 1 at 16.  Palmer exhausted this ground by raising it as the third claim in her amended Rule 3.850 motion.  Ex. S at 30-32.

The state post-conviction trial court denied the claim at the conclusion of the evidentiary hearing, making findings on the record:

> Ground Three, failure to move for a mistrial based upon the statements of the prosecutor, my ruling would be the same.  It was not ineffective to fail to move for a mistrial, nor was the defendant prejudiced.

Ex. S at 209.  On appeal, the First DCA affirmed without an opinion, an adjudication on the merits entitled to deference under 28 U.S.C. § 2254(d).  *See* Richter, 562 U.S. at 99.   The record supports the state courts' determination.  *See* Wilson, 138 S. Ct. at 1192.

As explained in the analysis of Ground 6, *supra*, the prosecutor's comments were consistent with the trial judge's ruling.  The judge explained, in denying post-conviction relief, that he would have denied a motion for mistrial.  Defense counsel cannot be ineffective for not filing a motion that would have been properly denied.  *See, e.g.*, Card, 911 F.2d at 1520 (11th Cir. 1990); Card v. State, 497 So. 2d 1169, 1177 (Fla. 1986) ("Counsel cannot be labeled ineffective for failing to raise issues which have no merit.").

Based on the foregoing, Petitioner Palmer has not shown that the state courts' adjudication of this ground involved an unreasonable application of clearly established federal law or that it was based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(1)-(2). Under the double deferential review this Court applies to a Strickland claim evaluated pursuant to the § 2254(d)(1) standard, this ground should be denied.

### Ground 7(b): IAC – Cumulative Effect of Failure to Object to Prosecutor's Comments on Sudden Provocation and Failure to Move for Mistrial

In the second part of Ground 7, Palmer asserts defense counsel provided ineffective assistance by the cumulative effect of counsel's failure to object to the prosecutor's comments on sudden provocation and by not moving for a mistrial. ECF No. 1 at 17; Ex. S at 143. Palmer exhausted this ground by raising it as the fourth claim in her amended Rule 3.850 motion. Ex. S at 32-33.

The state post-conviction trial court denied the claim at the conclusion of the evidentiary hearing, finding "[t]here is no cumulative error because there was no error in Ground Four." Ex. S at 209. On appeal, the First DCA affirmed without an opinion, an adjudication on the merits entitled to deference under 28 U.S.C. § 2254(d). *See* Richter, 562 U.S. at 99. The

record supports the state courts' determination.  *See* <u>Wilson</u>, 138 S. Ct. at 1192.

The Eleventh Circuit has rejected an argument of cumulative error in the context of IAC claims, explaining the U.S. Supreme Court has not specifically addressed the cumulative error doctrine in such context, but that Court has determined "that 'there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt.'" <u>Forrest v. Fla. Dep't of Corr.</u>, 342 F. App'x 560, 565 (11th Cir. 2009) (quoting <u>United States v. Cronic</u>, 466 U.S. 648, 659 n.26 (1984)).  In this case, as explained in the analysis of Grounds 6 and 7(a), *supra*, the prosecutor's comments were consistent with the trial judge's ruling and the record supports the state courts' determination.  Petitioner has not shown any of counsel's alleged errors, considered singly, constitute ineffective assistance and, therefore, no cumulative error has occurred.

Based on the foregoing, Petitioner Palmer has not shown that the state courts' adjudication of this ground involved an unreasonable application of clearly established federal law or that it was based on an unreasonable determination of the facts.  *See* 28 U.S.C. § 2254(d)(1)-(2).  Under the

double deferential review this Court applies to a <u>Strickland</u> claim evaluated

pursuant to the § 2254(d)(1) standard, this ground should be denied.

### <u>Ground 8</u>:  IAC – Failure to Object to Jury Instruction on Heat of Passion Upon Sudden Provocation

In her eighth ground, Palmer asserts defense counsel provided

ineffective assistance by not objecting to the trial court's "confusing heat of

passion upon a sudden provocation jury instruction."  ECF No. 1 at 17.

Palmer exhausted this ground by raising it as the fifth claim in her amended

Rule 3.850 motion.  Ex. S at 34-36.

The state post-conviction trial court denied the claim, making the

following findings on the record at the conclusion of the evidentiary hearing:

> Ground Five, failure to object to jury instruction on heat of passion and sudden provocation, first, I do not think that it was an incorrect statement of the law.  Therefore, there was certainly no reason to object.  As I've indicated, I gave the instruction, the second proposal from the defense.  I would guess that they perceived I was not likely to give their first version and came back with a fall-back position.  I gave that instruction.  I think the instruction that I gave was an accurate statement of the law, and, therefore, it was certainly not ineffective to fail to object.

> I don't – I disagree with Mr. Thomas that getting their magic language as they had initially proposed it was likely to have affected the verdict.  I think it would have had no effect on the verdict.

Ex. S at 209.  On appeal, the First DCA affirmed without an opinion, an

adjudication on the merits entitled to deference under 28 U.S.C. § 2254(d).

*See* <u>Richter</u>, 562 U.S. at 99.    The record supports the state courts'
determination.  *See* <u>Wilson</u>, 138 S. Ct. at 1192.

 In particular, as explained in the analysis of Ground 6, *supra*, during
the charge conference, the defense had requested a heat-of-passion
instruction, Ex. A at 35, and discussion occurred among counsel and the
judge regarding where to place the instruction, Ex. I at 879-83.  The judge
suggested putting this instruction after the instructions on first and second
degree murder, and defense counsel agreed "that's an appropriate
placement" as "[i]t says that it's a defense to both first and second degree
murder."  *Id.* at 883.  Accordingly, after the instruction on second degree
murder and before the manslaughter instruction, the judge instructed:

> In considering whether the evidence has proved
> premeditation as to first degree murder or depraved mind as to
> second degree murder, you may also consider whether a sudden
> provocation of the sort that would arouse strong emotions in an
> ordinary reasonable person caused the defendant to be
> overcome with such strong emotion that she was not able to act
> with premeditation or depraved mind.

Ex. A at 97; *see* Ex. K at 1069.

 The trial court did not err in its ruling and defense counsel cannot be
ineffective for not raising a futile issue.  If defense counsel had objected, the
judge would have overruled the objection.  *See, e.g.*, <u>Card</u>, 911 F.2d at 1520;
<u>Maxwell v. Wainwright</u>, 490 So. 2d 927, 932 (Fla. 1986) ("[W]e cannot find

ineffectiveness based on lack of objection or argument when counsel could reasonably have decided that such objection or argument would have been futile . . . .").

Based on the foregoing, Petitioner Palmer has not shown that the state courts' adjudication of this ground involved an unreasonable application of clearly established federal law or that it was based on an unreasonable determination of the facts.  *See* 28 U.S.C. § 2254(d)(1)-(2).  Under the double deferential review this Court applies to a Strickland claim evaluated pursuant to the § 2254(d)(1) standard, this ground should be denied.

### Ground 9:  IAC – Failure to Object to Omission of Heat of Passion/Sudden Provocation from Verdict Form

In her ninth ground, Palmer asserts defense counsel provided ineffective assistance by not objecting "to the heat of passion upon sudden provocation not being made an option on the verdict form."  ECF No. 1 at 17. Palmer exhausted this ground by raising it as the sixth claim in her amended Rule 3.850 motion.  Ex. S at 36-39.

The state post-conviction trial court denied the claim, making the following findings on the record at the conclusion of the evidentiary hearing:

> Ground Six, failing to object to the verdict form, I don't think there's any legal support for what the defendant has suggested should be done on the verdict form.  I would not have done that. It's not legally required, certainly not ineffective assistance of

counsel.  The "failed to ask for that interrogatory on the verdict form," the defendant was not prejudiced.

Ex. S at 209-10.  On appeal, the First DCA affirmed without an opinion, an adjudication on the merits entitled to deference under 28 U.S.C. § 2254(d).  *See* Richter, 562 U.S. at 99.   The record supports the state courts' determination.  *See* Wilson, 138 S. Ct. at 1192.

Petitioner cites to no legal authority to support her assertion that the verdict form should have included a "heat of passion" option.   From the postconviction judge's findings, even if defense counsel had objected and requested such option, the judge would have overruled the objection.  Defense counsel is not ineffective for failing to make a futile objection.  *See, e.g.*, Card, 911 F.2d at 1520; Maxwell, 490 So. 2d at 932.

Based on the foregoing, Petitioner Palmer has not shown that the state courts' adjudication of this ground involved an unreasonable application of clearly established federal law or that it was based on an unreasonable determination of the facts.   *See* 28 U.S.C. § 2254(d)(1)-(2).   Under the double deferential review this Court applies to a Strickland claim evaluated pursuant to the § 2254(d)(1) standard, this ground should be denied.

### <u>Ground 10</u>:  IAC – Failure to Move for JOA for Confusing Jury Instruction and Incomplete Verdict Form

In her tenth ground, Palmer asserts defense counsel provided ineffective assistance "for failing to file a judgment of acquittal as to the confusing jury instruction and incomplete verdict form."  ECF No. 1 at 18. Palmer exhausted this ground by raising it as the seventh claim in her amended Rule 3.850 motion.  Ex. S at 39-41.

The state post-conviction trial court denied the claim at the conclusion of the evidentiary hearing, finding "[t]here was no basis to ask for a JOA." Ex. S at 210.  On appeal, the First DCA affirmed without an opinion, an adjudication on the merits entitled to deference under 28 U.S.C. § 2254(d). *See* <u>Richter</u>, 562 U.S. at 99.  The record supports the state courts' determination.  *See* <u>Wilson</u>, 138 S. Ct. at 1192.

A motion for judgment of acquittal (JOA) challenges the legal sufficiency of the evidence.  § 924.051(3), Fla. Stat. (2013).  Thus, as the state post-conviction judge found, there was no basis for a JOA motion challenging the jury instruction and verdict form.  As explained, *supra*, defense counsel is not ineffective for failing to make a futile objection.  *See, e.g.*, <u>Card</u>, 911 F.2d at 1520; <u>Maxwell</u>, 490 So. 2d at 932.

Based on the foregoing, Petitioner Palmer has not shown that the state courts' adjudication of this ground involved an unreasonable application of clearly established federal law or that it was based on an unreasonable determination of the facts.   *See* 28 U.S.C. § 2254(d)(1)-(2).   Under the double deferential review this Court applies to a Strickland claim evaluated pursuant to the § 2254(d)(1) standard, this ground should be denied.

### **Ground 11**:  **IAC – Failure to Strike Juror for Cause**

In her eleventh ground, Palmer asserts defense counsel provided ineffective assistance for not moving to strike Juror Babcock for cause.  ECF No. 1 at 18.  Palmer asserts that "[p]rejudice arises where if Babcock did not agree with same-sex relationships and could no[t] say same sex, but called it a homosexual relationship, she was biased and any decision she rendered would be a biased one."  *Id*.  Palmer exhausted this ground by raising it as the eighth claim in her amended Rule 3.850 motion.  Ex. S at 42-45.

The state post-conviction trial court denied the claim at the conclusion of the evidentiary hearing, making the following findings on the record:

> Ground Eight, failure to move to strike the Juror Babcock for cause, I've reviewed the statements of Ms. Babcock.  There was not grounds for cause.  She would not have been struck for cause had that request been made.  That's not ineffective assistance of counsel, and the defendant is not prejudiced.

Ex. S at 210.   On appeal, the First DCA affirmed without an opinion, an adjudication on the merits entitled to deference under 28 U.S.C. § 2254(d). *See* Richter, 562 U.S. at 99.   The record supports the state courts' determination.  *See* Wilson, 138 S. Ct. at 1192.

The transcript of the jury selection reflects Juror Kathleen Babcock stated she was a retired kindergarten teacher, her husband is a retired deputy sheriff, and they have three adult children.   Ex. C at 35-36.  She answered that she would not have a problem following an instruction that the fact that a witness is employed in law enforcement does not mean that witness's testimony deserves more or less consideration than that of any other witness.  *Id.* at 36-37.  She indicated that she had "some health issues" that made it "a little difficult to sit for long periods of time" but she was okay so far.  *Id.* at 75.  She indicated that she would have no difficulty evaluating a self-defense claim "because I believe that we could each picture ourselves in that and evaluate correctly."  *Id.* at 118.

Of particular relevance to Petitioner's argument, during jury selection, defense counsel asked did "anybody personally here have experience with a same-sex relationship" or have "family or close friends."  *Id.* at 126.  In responding to one potential juror's answer, defense counsel asked, "And did you see anything different about their relationship that you would think was

different than a heterosexual relationship?" *Id.* at 127.  The potential juror

answered, "No."   *Id.*   [The defense struck this potential juror.]   Defense

counsel then stated, "And from what I understand, some have stereotypical

male/female roles and some don't."   *Id.* at 127.   Another potential juror

responded that she had relatives in same-sex relationships and she did not

personally agree with that lifestyle, but she loved her relatives.  *Id.* at 127-

28.   [The prosecutor struck this juror.]   A third potential juror mentioned

coworkers who "have shared that they are attracted to the same sex" and

"that's what they profess and that's what I accept."  *Id.* at 128.  [This juror

was selected for the jury.]   At this point, the defense counsel inquired of the

potential jurors:

> MS. COPEK [defense counsel]:  . . . Is there – obviously, this is
> an issue, also, that people fall on both sides.  Sometimes people
> are very anti same-sex marriage.  Some not – you know, pro
> same-sex marriage.  Is there anybody here who feels extremely
> strongly one way or the other that you think we should know
> about because, obviously, you've already heard, you're going to
> hear evidence about a same-sex relationship.

*Id.*  After a couple of potential jurors [both of whom were struck by the

defense] indicated they would not have a problem, defense counsel asked,

"Does anybody here feel like they would have an issue listening to the

evidence, you know, or having some sort of a – an influence on the fact that,

well, it's a same-sex couple?"  *Id.* at 129.  Another potential juror indicated it

would not be a problem. *Id.* [Defense counsel struck this juror.] Defense

counsel asked another question, "[D]o you believe . . . that in a lot of same-

sex relationships, even though they are the same gender, there tends to be

some stereotypical male/female roles? Do you think that happens?" *Id.* Two

potential jurors indicated sometimes that happens but not always. *Id.* at 130.

[One of these jurors was stricken by the defense and the other was selected

to serve on the jury.] The following then transpired on the record between

defense counsel and Ms. Babcock:

> MS. COPEK [defense counsel]: Ms. Babcock, do you agree?
>
> PROSPECTIVE JUROR BABCOCK: I don't know anything about homosexual relationships. I am a strong Christian and I – morally, I believe it's wrong.
>
> MS. COPEK: That it's wrong. Okay.
>
> PROSPECTIVE JUROR BABCOCK: But, but, it is what it is, I mean. I mean, I'm not going to condemn somebody. That's not my job. But.
>
> MS. COPEK: That's your belief.
>
> PROSPECTIVE JUROR BABCOCK: Right.
>
> MS. COPEK: And, again, that's not right or wrong. I mean, that's right for you. Okay. But it wouldn't influence you in evaluating the evidence?
>
> PROSPECTIVE JUROR BABCOCK: No, no.

*Id.*

During the conference following the questioning of the potential jurors, counsel for both sides indicated that Ms. Babcock, the third potential juror considered, was acceptable and she became the first juror selected for the trial. *Id.* at 146. At the conclusion of the jury selection conference, the judge inquired:

> THE COURT: . . . Has Ms. Palmer had an opportunity to participate in this process?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: All right. And you're agreeable with that jury, Ms. Pye (sic)?
>
> THE DEFENDANT: Yes.
>
> MS. COPEK [defense counsel]: Palmer.
>
> THE COURT: All of it, I'm talking about the whole jury. Do you understand?
>
> THE DEFENDANT: Yes, sir.

*Id.* at 153.

Juror Babcock indicated that she could properly evaluate the evidence even though she believed same-sex relationships were morally wrong; her belief would not influence her evaluation of the evidence presented at trial. *See, e.g.*, Kopsho v. State, 959 So. 2d 168, 170 (Fla. 2007) (explaining test trial courts use "for determining juror competence is whether the juror can

lay aside any bias or prejudice and render a verdict solely on the evidence presented and the instructions on the law given by the court" and "[a] juror must be excused for cause if any reasonable doubt exists as to whether the juror possess an impartial state of mind"); Parker v. State, 641 So. 2d 369, 373 (Fla. 1994) ("In evaluating a juror's qualifications, the trial judge should evaluate all of the questions and answers posed to or received from the juror."); *see also, e.g.*, Carratelli v. State, 961 So. 2d 312, 324 (Fla. 2007) ("[W]here a postconviction motion alleges that trial counsel was ineffective for failing to raise or preserve a cause challenge, the defendant must demonstrate that a juror was actually biased."). Nothing indicates Juror Babcock could not render a verdict solely on the evidence and the instructions given by the judge. *See, e.g.*, Patton v. Yount, 467 U.S. 1025, 1037 n. 12 (1984) (explaining "constitutional standard that a juror is impartial only if he can lay aside his opinion and render verdict based on evidence presented in court" is question of federal law and "whether a juror can in fact do that is a determination to which habeas courts owe special deference").

Moreover, from the postconviction judge's findings, even if defense counsel had moved to strike Babcock for cause, the judge would not have allowed that strike. Defense counsel is not ineffective for failing to make a futile motion. *See, e.g.*, Card, 911 F.2d at 1520; Maxwell, 490 So. 2d at 932

("[W]e cannot find ineffectiveness based on lack of objection or argument when counsel could reasonably have decided that such objection or argument would have been futile in view of the established rules of law on jurors' qualifications.").

Perhaps more importantly, Palmer affirmatively stated to the judge that she had participated in the jury selection process and was "agreeable with" the selected jury. Ex. C at 153; *see* Ex. S at 148. She thus waived any IAC argument for failing to strike a juror for cause. *See* <u>Kelley v. State</u>, 109 So. 3d 811, 814 (Fla. 1st DCA 2013) (affirming denial of post-conviction IAC claim: "Appellant was fully aware of the alleged bias of jurors . . . when he informed the trial court that he agreed with the jury selected by his trial counsel. Accordingly, even if his counsel was ineffective for not attempting to strike the jurors for cause, Appellant cannot go behind his representation to the trial court that he was satisfied with the jury by alleging his counsel was ineffective in jury selection.").

Based on the foregoing, Petitioner Palmer has not shown that the state courts' adjudication of this ground involved an unreasonable application of clearly established federal law or that it was based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(1)-(2). Under the

double deferential review this Court applies to a <u>Strickland</u> claim evaluated

pursuant to the § 2254(d)(1) standard, this ground should be denied.

### <u>Ground 12</u>:  IAC – Failure to Invoke Statutory Immunity and Move to Dismiss under Rule 3.190(b)

In her twelfth ground, Palmer asserts defense counsel provided

ineffective assistance for not seeking to invoke statutory immunity and file a

pretrial motion to dismiss under Florida Rule of Criminal Procedure 3.190(b).

ECF No. 1 at 18.  Palmer exhausted this ground by raising it as the ninth

claim in her amended Rule 3.850 motion.  Ex. S at 45-47.

The state post-conviction trial court denied the claim at the conclusion

of the evidentiary hearing, making the following findings on the record:

> Failure to file a stand your ground hearing motion
> essentially has been abandoned here.  I don't find any basis to
> have done that.  It would not have affected anything.  Any such
> motion would have clearly been denied.  There's no ineffective
> assistance of counsel or prejudice.

Ex. S at 210.  On appeal, the First DCA affirmed without an opinion, an

adjudication on the merits entitled to deference under 28 U.S.C. § 2254(d).

*See* <u>Richter</u>, 562 U.S. at 99.

The record supports the post-conviction judge's findings that a pretrial

motion to dismiss on the basis of "stand your ground" or immunity under

section 776.032, Florida Statutes, would have been denied.  *See* <u>Wilson</u>,

138 S. Ct. at 1192.  Among other things, as indicated the analysis of Ground 3, *supra*, evidence in this case included text messages from Palmer just prior to the stabbing that could reasonably be read as conflicting with her self-defense theory.  *See, e.g.*, <u>Mederos v. State</u>, 102 So. 3d 7, 11 (Fla. 1st DCA 2012) (denying petition for writ of probation challenging trial court's denial of motion to dismiss on basis of immunity from prosecution pursuant to Stand Your Ground Law:  "[T]he testimony below 'contradicts wildly.'  While there was testimony supporting petitioner's argument that he was acting in defense of Ribas and himself and that he was defending against a forcible felony, there was also competent, substantial evidence that he was not acting in self-defense or in defense of a forcible felony at the time of the stabbing.").  Defense counsel is not ineffective for failing to make a futile motion.  *See, e.g.*, <u>Card</u>, 911 F.2d at 1520; <u>Maxwell</u>, 490 So. 2d at 932.

Petitioner Palmer has not shown that the state courts' adjudication of this ground involved an unreasonable application of clearly established federal law or that it was based on an unreasonable determination of the facts.  *See* 28 U.S.C. § 2254(d)(1)-(2).  Under the double deferential review this Court applies to a <u>Strickland</u> claim evaluated pursuant to the § 2254(d)(1) standard, this ground should be denied.

**Ground 13**:  IAC – Improper Direct Questioning of Dr. Karla Fischer
    &
**Ground 14**:  IAC – Failing to Object on State's Cross of Dr. Fischer

These two grounds concern the trial testimony of defense expert, Dr. Karla Fischer.  In particular, in her thirteenth ground, Palmer asserts defense counsel provided ineffective assistance by not properly questioning expert witness, Dr. Karla Fischer.  ECF No. 1 at 18.  In her fourteenth ground, Palmer asserts defense counsel provided ineffective assistance by not objecting to the prosecutor's questioning of Dr. Fischer that was "harassing in nature" such "that the judge had to step in and ask the state to move on."  ECF No. 1 at 19.  Palmer exhausted these grounds by raising them as the tenth and eleventh claims in her amended Rule 3.850 motion.  Ex. S at 47-48, 49-53.

The state post-conviction trial court denied the claims at the conclusion of the evidentiary hearing, making the following findings on the record:

> Ground Ten, failure to properly question Dr. Fischer, I don't find that to have been established.  Dr. Fischer was appropriately questioned, and the jury just didn't accept what she said.  [Ground Eleven,] I don't find that there was anything that Ms. Ray did on cross-examination that necessarily should have been objected to.  I think you have to keep it in the context that Dr. Fischer is essentially a professional expert.  She is not some lay witness that a jury is going to be feeling sorry for because the prosecutor goes after her vigorously.  There was no ineffective assistance of counsel for failure to object, nor was the defense prejudiced.

Ex. S at 210-11.  On appeal, the First DCA affirmed without an opinion, an adjudication on the merits entitled to deference under 28 U.S.C. § 2254(d). *See* <u>Richter</u>, 562 U.S. at 99.  The record supports the state courts' determination.  *See* <u>Wilson</u>, 138 S. Ct. at 1192.

As referenced in the analysis of Ground 1, *supra*, the defense called Dr. Karla Fischer, a psychologist, to testify as an expert in the psychological effects of domestic violence.  Ex. J at 915-18.  Dr. Fischer explained her work:

> There are really three things I do in my work.  The first thing I do is I teach at the law school at the University of Illinois.  I run the domestic violence clinic where I teach law students to work with domestic violence victims who are getting orders of protection and divorces.
>
> The second thing I do is research related consultations on domestic violence with domestic violence organizations or other people who are interested in domestic violence issues.
>
> And the third thing I do is legal consultations like this case.

*Id.* at 915-16.  Dr. Fischer testified regarding her educational background:

> I have a Ph.D. in psychology from the University of Illinois. I also have a law degree from the University of Illinois.  I have a master's degree in psychology from the University of Illinois, and I have a bachelor's degree in psychology from Lewis & Clark College which is in Portland, Oregon.

*Id.* at 917.  She testified that she has testified as an expert in court, regarding the psychological effects of domestic violence battering, "approximately 17 or 18 times over the past 20 years."  *Id.* at 918.

Dr. Fischer testified that she conducted a domestic violence evaluation with Palmer, "for the purpose of assessing whether or not there is psychological evidence that's consistent with self-defense."  *Id.*  She reviewed the police reports, the autopsy report, and the crime scene investigation, as well as the videotaped statements of Palmer.  *Id.* at 921-22.  She interviewed Palmer twice, with each interview lasting around twelve hours.  *Id.* at 922; *see id.* at 944.  She explained the interview process and violence assessment and whether a distinction existed between them:

> Well, I suppose I would say as part of the interview, the interview process, it's not a cookie cutter process to try to evaluate whether or not there's psychological evidence that someone acted in self-defense.  Because every case and every person and every person's history is different, there's not a canned set of questions that I use.  So there's an open ended part of the interview process, which I think speaks to your question of what's the difference between an interview and an assessment.
>
> There's an open ended part of the interview process where I asked her questions about her history and what happened in the incidents that led to the stabbing.
>
> And then there's a more closed ended question process that I just described where I used a domestic violence tool and asked those very specific questions.

*Id.* at 922-23.  Dr. Fischer explained "[t]here's about a hundred questions" in the violence assessment, and "[t]he questions start with physical violence, and then they move to sexual violence, and then they move to the many forms of psychological or emotional violence."  *Id.* at 923.  She completed the process with Palmer and explained her findings:

> I found that Ms. Palmer had experienced a number of different incidences of domestic violence.  Prior to the events that led to the stabbing, there were six to eight larger – what I would call larger, more severe incidences, times when she considers that she was beaten up, in which she was punched, scratched, slapped, strangled, and perhaps pushed and shoved around as well.
> Then there were some other, another number of incidences that I would consider to be more minor, where there might have been, for example, one push, one grab, one sort of harsh physical thing that happened, and then there was nothing more to that.  So Ms. Palmer herself identifies that there were six to eight times in which she feels she was physically assaulted in a way that was more severe than just a single physical action like a push or a grab.

*Id.* at 924.  She testified she "would characterize Ms. Palmer's past violence as moderate."  *Id.*  She explained "[t]here is no formal categorization," but she would say in her experience over the past twenty years, "someone's past experience of domestic violence is either very severe, severe or moderate" and she has "never run into a case where there's been a mild case of domestic violence."  *Id.*  She testified that Palmer "was a battered woman"

but "[s]he does not have battered woman's syndrome." *Id.* at 925-26. She

explained:

> Saying that someone has battered woman syndrome requires that you assess or that they have learned helplessness, which is a form of passivity over time in which battered women tend not to engage in help seeking as the violence in the relationship goes on. That did not characterize Ms. Palmer's relationship.
>
> . . . .
>
> The psychological effects of domestic violence from her experience don't fit into that particular model. And again, that's just one small model of research that is almost 30 years old. And in the past 30 years in domestic violence, the research has found many other kinds of psychological effects as the result from domestic violence.
>
> Battered woman syndrome is only one way to describe the psychological effects of domestic violence. There are other ways.

*Id.* at 926. Dr. Fischer explained the basis for her opinion that Palmer is a

battered woman:

> There are three. The definition of a battered woman has three elements to it. The first element is whether or not the person has experienced one or more forms of domestic violence. Ms. Palmer definitely experienced one or more forms of domestic violence prior to the incidences that led to the stabbing. The most severe of those was strangulation. However, she also experienced punching, grabbing, restraining, slapping as well.
>
> The second element of who's a battered woman is whether or not there was a pattern of control or manipulation within the relationship that was abusive.

So whether or not someone is a domestic violence victim is not just a function of whether or not she was abused, it also was about how the violence happened in that relationship. And in a relationship where there is a pattern of domestic violence, there's often a pattern of control and domination or manipulation that goes with that.

And what I mean by that is that the person who is abusing the other person is engaging in violence for a strategic reason. They want the person to do what they want. That's what I mean by somebody exhibiting control within the context of domestic violence.

So in other words, the violence that tended to erupt between Ms. Palmer and Ms. Washington was typically the result of Ms. Palmer not doing what Ms. Washington wanted her to do.

. . . .

There's a third element, which is that battered women tend to respond to the abuse and control in their relationships with particular coping strategies. And by coping strategies, I mean what they do psychologically to manage the abuse and control that's in their lives.

There are two coping strategies that are common among battered women that Ms. Palmer exhibited. The first is called denial in which battered women refuse to acknowledge that there is violence and abuse in their relationship. This is sometimes why battered women won't call the police. It's sometimes why battered women won't make police reports or engage in other actions in which they have to publicly say, I am being abused, or, I am a battered woman.

The second coping strategy that applies to Ms. Palmer is something called minimization, and minimization is when we make light of what happened to us. We say it wasn't so bad or it could have been worse.

And for Ms. Palmer, she also engaged in minimization in the sense that she didn't think that the violence against here, even though it involved strangulation which is a potentially lethal form of violence, she didn't think that it was terrible. She didn't think that that was a reason to even leave the relationship with Ms. Washington.

. . . .

In the research literature in domestic violence, a battered woman is someone who has experienced abuse, who has been controlled or has been – there has been control within that abusive relationship.

And the third thing is that they have exhibited the common, at least one of the common coping characteristics of battered women.

*Id.* at 927-29. Dr. Fischer testified that being a battered woman is not a defense to a crime. *Id.* at 929.

Counsel questioned Dr. Fischer regarding whether she needed "to take further steps" to assess whether Palmer's battered woman classification "coupled with other facts or . . . other assessments . . . demonstrate psychological evidence to support that self-defense claim." *Id.* at 930. Dr. Fischer responded:

I think once you know that someone is a battered woman and you know the nature of the violence that she's experienced, I think the next thing that makes sense to take a look at is, well, what happened on the day that the killing happened?

> The issue is whether or not she was afraid of her partner at the time that she stabbed her. And understanding the past history of domestic violence helps you understand – helps you compare the nature of the violence that happened before the stabbing to what she had experienced before. So that's the next thing that I looked at.

*Id.* at 930-31. Dr. Fischer testified that she looked at that and she "found what is typical in almost all of the battered women homicide cases that [she] has worked on, and that is that the violence that happened prior to the stabbing was a great escalation from the violence that had happened prior to the stabbing." *Id.* at 931. She explained that "for example, it wasn't necessarily the type of abuse that was being perpetrated on Ms. Palmer by Ms. Washington," but "[i]t was the force that was being used to perpetrate that violence." *Id.* Further, "for example, when Ms. Palmer described the strangulation that occurred in the bathtub prior to the stabbing, she described being unable to push Ms. Washington's hands off her throat, as she used to be able to do, in the five or six times that Ms. Washington had strangled her prior to that." *Id.* at 931-32. Dr. Fischer further explained:

> So when I say there was an escalation in the violence, what I mean is that Ms. Palmer reported that the things that were being done to her were things that had happened before, but they were being done at such force that she was having difficulty fighting back.

> The second thing that was different in the events that led to the stabbing in terms of the violence that was perpetrated

compared to the violence that occurred in the history of the relationship prior to the stabbing was that the violence didn't stop. It went on and on.

In Ms. Palmer's experience with the incidences in which she was beat up prior to the stabbing, they always ended relatively quickly, either because Ms. Washington would stop because Ms. Palmer would say, you're hurting me, or because somebody broke up the fight or the altercation.

In the events that led to the stabbing, there were numerous flares of the violence.  There were three separate strangulations that night.  And in between those were what I would call lulls in the violence in which there was an act of violence, but it just kept – what Ms. Palmer described is violence that just kept coming and coming.  And whereas in prior times, Ms. Washington would stop and it would be over.

During the, during the incidences that led to the stabbing, Ms. Washington didn't feel it was ever going to be over.  She felt that she was continuing to be offensively attacked even after she thought numerous times that it was finally over.

*Id.* at 932-33.

Dr. Fischer testified that "the lulls in the violence" the night of the stabbing were significant.  *Id.* at 933.  She explained that "if the pattern of your violence in the past is that it's predictable that certain things happen, then it's over," victims feel "when it's predictable, they feel like they're not in any incredible danger."  *Id.*  "When the violence becomes unpredictable, when it doesn't stop," however, "that's when victims feel an escalated sense

of danger that they don't know what's going to happen, and their fear escalates quickly as a result." *Id.* She further explained:

> In a, in a, in an incident in which a victim becomes more afraid than she has been before, there can be an invocation of what's called the flight or fight syndrome. When someone feels that they are about to be killed or they are about to be seriously harmed which is the way that a battered woman feels when she's in an incident of violence that seems unpredictable, that's different. Then that's worse than it's been before.
>
> That flight or fight syndrome has a power psycho-physiological response inside the body, in that your body becomes flooded with adrenaline. There are other hormonal changes. And the reason for all these physiological and hormonal changes is to give the body energy to fight back in an attack. Those physiological changes also have psychological changes as well. That hormonal rush has an, has an impact on a victim's ability to make conscious choices and decisions, and it also affects people's memory.

*Id.* at 934.

Dr. Fischer also testified that, in her opinion, Palmer had "a few symptoms of post-traumatic stress disorder that . . . had occurred before the events that led to the stabbing" as "she reported a few isolated symptoms that would be consistent with someone who has been battered in a moderate way." *Id.* at 937. According to Dr. Fischer, Palmer's post-traumatic stress disorder (PTSD) symptoms were "very mild" before the stabbing but "very strong" after the stabbing. *Id.* Dr. Fischer explained:

> I believe that her PTSD symptoms that she has after the stabbing were the result of her being attacked by Ms. Washington just before the stabbing, the strangulations, the punchings that she experienced that was the trauma that caused her post-traumatic stress disorder symptoms. Although you can't necessarily separate the stabbing from the domestic violence that happened just before it, I see the stabbing more as a behavioral reaction to the trauma as opposed to the trauma itself.

*Id.* at 937-38. Dr. Fischer concluded that Palmer had acted in self-defense when she stabbed the victim: "I believe that the post-traumatic stress disorder symptom patterns, as well as the way that Ms. Palmer described her emotional and cognitive perceptions during the time that she was being attacked by Ms. Washington, I believe that she did act in self-defense, yes." *Id.* at 938.

As demonstrated by the foregoing, and as found by the state post-conviction judge, defense counsel appropriately questioned Dr. Fischer, eliciting her opinions, based on her evaluation of Palmer, regarding Palmer's condition and behavior. Importantly for the defense, counsel presented Dr. Fischer's opinions that Palmer is a battered woman, she suffered from PTSD, and she acted in self-defense when she stabbed and killed the victim. Given that the jury rejected the self-defense argument, the jury evidently did not credit Dr. Fischer's opinion testimony. This does not mean, however,

that defense counsel provided ineffective assistance in questioning Dr. Fischer.

Palmer also asserts defense counsel provided ineffective assistance by not objecting to the prosecutor's questioning of Dr. Fischer on cross-examination that Palmer alleges was "harassing in nature" such "that the judge had to step in and ask the state to move on."  ECF No. 1 at 19.  That portion of the cross-examination appears in the transcript as follows, shortly after the prosecutor questioned Dr. Fischer about the text messages Palmer sent to her mother the night of the stabbing:

> Q  Okay.  So you're saying that these text messages do not change your opinion as to whether or not this woman was acting in self-defense that night?
>
> A  That's correct.
>
> Q  And the defendant told you she doesn't recall the context of the messages, right?
>
> A  She didn't recall the content of them, correct.  She remembered texting her mother.
>
> Q  And based on that assumption, you're saying that it's inconsistent with her – it's not inconsistent with her acting in self-defense, right?
>
> A  What's the assumption?
>
> Q  You're assuming everything this woman tells you is true, that she doesn't remember the text messages?

A  I believe that she doesn't remember the content of the text messages, yes.

Q  Because she's got a bruise on her neck and a bruise on her hand and a scratch on her face?

A  Those things are related to whether or not Ms. Washington physically attacked her before she stabbed her.  That is not related to the text messages.

Q  I don't understand.

A  I don't think I understand your lack of understanding.  Do you want to ask another question?

Q  Would you like me to ask another question?

A  You're the one in charge here.

THE COURT:  Ma'am – Ms. Ray, Ms. Fischer, let's move on. Ask a question Ms. Ray.

Q  Okay.  You're telling us you believe what the defendant told you because you're what, looking for the physical evidence as well on her body?

A  If someone, if a battered woman tells me that she was attacked in a particular way, and there are injuries that are consistent with her being attacked, then yes, I think that does suggest that she was physically attacked before she stabbed Ms. Washington.

*Id.* at 950-51.  At three other points during cross, the judge intervened but did not say "let's move on."  *See id.* at 940, 947-48, 955.  As the state post-conviction court concluded, nothing the prosecutor did during cross necessitated an objection.  *See id.* at 938-70.

Petitioner Palmer has not shown that the state courts' adjudication of this ground involved an unreasonable application of clearly established federal law or that it was based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(1)-(2). Under the double deferential review this Court applies to a Strickland claim evaluated pursuant to the § 2254(d)(1) standard, this ground should be denied.

### Ground 15: IAC – Failure to Object to Dr. Greg Prichard on Rebuttal

In her fifteenth ground, Palmer asserts defense counsel provided ineffective assistance by not objecting to the prosecutor calling Greg Prichard as a rebuttal witness. ECF No. 1 at 19. Palmer exhausted this ground by raising it as the twelfth claim in her amended Rule 3.850 motion. Ex. S at 53-57.

The state post-conviction trial court denied the claim at the conclusion of the evidentiary hearing, making the following findings on the record:

> Ground Twelve, failure to object to Dr. Prichard as a rebuttal witness, well, in fact there was an objection by Mr. Thomas as to Dr. Prichard's testimony. If it had been sustained, it would have pretty well meant Dr. Prichard had nothing to say. I overruled that objection. That was preserved for appeal. I don't know whether that was argued or not, but it could have been or should have been raised on appeal if that was the error. There was no ineffective assistance of counsel nor any prejudice.

Ex. S at 211.   On appeal, the First DCA affirmed without an opinion, an adjudication on the merits entitled to deference under 28 U.S.C. § 2254(d). *See* <u>Richter</u>, 562 U.S. at 99.   The record supports the state courts' determination.   *See* <u>Wilson</u>, 138 S. Ct. at 1192.

As explained in the analysis of Ground 1, *supra*, the State presented Dr. Prichard, in rebuttal, as an expert in forensic psychology; defense counsel did not voir dire or object to Dr. Prichard's status as an expert.   Ex. P at 1029.   As also explained in the analysis of Ground 1, *supra*, and as the state post-conviction trial court judge found, however, defense counsel did object to Dr. Prichard's testimony, as reflected in the trial transcript:

MS. RAY [prosecutor]:   All right.   The State would tender Dr. Prichard as an expert in forensic psychology.

THE COURT:   Do you wish to voir dire?

MR. THOMAS [ defense counsel]:   No objection.

THE COURT:   All right.

BY MS. RAY:

Q   And, Dr. Prichard, were you hired by the State of Florida in the case of the State versus Palmer?

A   Yes.

Q   What were you asked to do?

A  I was asked to assess Ms. Palmer and specifically address the question as to whether it appeared to me Ms. Palmer had symptoms of a syndrome called battered person or battered spouse syndrome, and whether if those symptoms –

MR. THOMAS:  Judge, I'm going to object to this line of testimony.  It has nothing to do with this case.  It's not ever been asserted –

THE COURT:  Let's not get into speaking objections, please, Mr. Thomas.  You know better than that.

Let's go sidebar, please.

(Private bench conference as follows:)

THE COURT:  The question asked was what was he initially asked to do.

MR. THOMAS:  I don't –

THE COURT:  Go ahead.

MR. THOMAS:  Yes.  He's creating a straw man defense base or person, in this situation, Judge.  Number one, it's not relevant.  Now, if all he's going to say is, well, I was hired to assess her for battered spouse syndrome, but now I have been asked to assess something different in court, and he doesn't give any conclusions from the original report, then that might be okay.  But we shouldn't be talking about battered spouse syndrome in his assessment when it's not asserted and it's not relevant in this proceeding.  It never has been.  It's not in our notice.

THE COURT:  Ms. Ray.

MS. RAY:  I think if he would have been allowed to answer his question initially, my understanding was it was battered spouse syndrome.  Everything that he's going to testify to, which is going to be pretty limited because I think the jury has heard all the

information they probably need at this point, goes to things that would fall under either category, self defense or battered woman syndrome. This whole defense goes to her state of mind, and I'm not going to be asking him anything other than issues that went to her state of mind at the time of the killing, which is what this case is about.

MR. THOMAS: Judge, if I may, he also stated on deposition that he was not asked and he did not assess Star Palmer for the issue of self-defense. It's in his deposition.

THE COURT: And that goes to what issue?

MR. THOMAS: To – the point is of the relevancy. He did not assess self-defense and all he assessed was battered spouse syndrome. The only thing he can do is what he's done since he's been sitting here.

THE COURT: I'll overrule the objection.

MR. THOMAS: I'd like a continuing one, Judge.

(End of private bench discussion.)

Ex. J at 1029-31. Dr. Prichard went on to testify that he met with Palmer twice, spending a total of about three hours with her. *Id.* at 1032. He reviewed the police reports, depositions of Dr. Meyer and Dr. Fischer, Dr. Meyer's report, witness statements, medical examiner reports, and the text messages between Palmer and her mother. *Id.* Dr. Prichard concluded that battered spouse syndrome symptoms "were not what motivated the crime." *Id.* at 1037. He further opined that "[i]t did not appear that what motivated the crime was fear, fear or helplessness," which he testified "are essentially

the motivators when we talk about self-defense claims." *Id.* at 1038.  He explained his opinion, as quoted in the analysis of Ground 1, *supra*.  *See id.* at 1038-39.  Defense counsel raised another relevancy objection during Dr. Prichard's testimony, but the judge overruled it.  *Id.* at 1037.  Defense counsel thoroughly cross-examined Dr. Prichard.  *Id.* at 1039-53.

Petitioner Palmer has not shown that the state courts' adjudication of this ground involved an unreasonable application of clearly established federal law or that it was based on an unreasonable determination of the facts.  *See* 28 U.S.C. § 2254(d)(1)-(2).  Under the double deferential review this Court applies to a Strickland claim evaluated pursuant to the § 2254(d)(1) standard, this ground should be denied.

### Ground 16:  IAC – Failure to Subject State's Case to Meaningful Testing

In her sixteenth, and final ground, Palmer asserts defense counsel provided ineffective assistance for not subjecting the State's case to meaningful adversarial testing.  ECF No. 1 at 19.  Palmer raised this as the thirteenth and fourteenth grounds in her amended Rule 3.850 motion.  Ex. S at 57-63.  She states, in her supporting facts in the petition:

> The Defendant is entitled to relief when she demonstrates that counsel violated this guarantee through deficient performance and was prejudiced by the deficiency.  In this case the Defendant has demonstrated how counsel violated the Sixth Amendment

guarantee, has shown it through counsel's deficient performance
and how their deficient performance prejudice[d] her.

ECF No. 1 at 19.

As Respondent indicates, Palmer appears to allege in this ground that

the cumulative effect of defense counsels' alleged deficient performance

prejudiced her.  ECF No. 11 at 105-06; *see* Ex. S at 38, 57-63.  As explained

in the analysis of Ground 7(b), *supra*, however, the Eleventh Circuit has

rejected an argument of cumulative error in the context of IAC claims,

explaining the U.S. Supreme Court has not specifically addressed the

cumulative error doctrine in such context, but that Court has determined "that

'there is generally no basis for finding a Sixth Amendment violation unless

the accused can show how specific errors of counsel undermined the

reliability of the finding of guilt.'"  Forrest, 342 F. App'x at 565 (quoting Cronic,

466 U.S. at 659 n.26).  Palmer has not shown any of counsel's alleged errors,

considered singly, constitute ineffective assistance and, therefore, no

cumulative error has occurred.

Based on the foregoing, Petitioner Palmer has not shown that the state

courts' adjudication of this ground involved an unreasonable application of

clearly established federal law or that it was based on an unreasonable

determination of the facts.  *See* 28 U.S.C. § 2254(d)(1)-(2).  Under the

double deferential review this Court applies to a <u>Strickland</u> claim evaluated pursuant to the § 2254(d)(1) standard, this ground should be denied.

## Conclusion

Petitioner Starquineshia Palmer is not entitled to federal habeas relief. The § 2254 petition (ECF No. 1) should be denied.

## Certificate of Appealability

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." Rule 11(b) provides that a timely notice of appeal must still be filed, even if the court issues a certificate of appealability.

Petitioner fails to make a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2); <u>Slack v. McDaniel</u>, 529 U.S. 473, 483-84 (2000) (explaining substantial showing) (citation omitted). Therefore, the Court should deny a certificate of appealability.

The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." The parties shall make any argument as to whether

a certificate should issue by filing objections to this Report and Recommendation.

Leave to appeal in forma pauperis should also be denied.  *See* Fed. R. App. P. 24(a)(3)(A) (providing that before or after notice of appeal is filed, the court may certify appeal is not in good faith or party is not otherwise entitled to appeal in forma pauperis).

## **Recommendation**

It is therefore respectfully **RECOMMENDED** that the Court **DENY** the § 2254 petition (ECF No. 1).  It is further **RECOMMENDED** that a certificate of appealability be **DENIED**.

**IN CHAMBERS** at Tallahassee, Florida, on February 5, 2021.

S/  Martin A. Fitzpatrick
**MARTIN A. FITZPATRICK**
**UNITED STATES MAGISTRATE JUDGE**


## **NOTICE TO THE PARTIES**

**Within fourteen (14) days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to these proposed findings and recommendations. Fed. R. Civ. P. 72(b)(2).  A copy of the objections shall be served upon all other parties.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  Fed. R. Civ. P. 72(b)(2).  Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control.  If a party fails to object to the magistrate judge's findings or**

recommendations as to any particular claim or issue contained in a Report and Recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. R. 3-1; 28 U.S.C. § 636.